**CANTELME & BROWN, P.L.C.**

A Professional Liability Company
3003 N. Central Avenue, Suite 600
Phoenix, Arizona 85012-2902
Tel (602) 200-0104   Fax (602) 200-0106
E-mail: djc@cb-attorneys.com / dbrown@cb-attorneys.com

David J. Cantelme, Bar No. 006313
D. Aaron Brown, Bar No. 022133
Samuel Saks, Bar no. 024260
*Attorneys for Plaintiffs*

**SNELL & WILMER L.L.P.**

One Arizona Center
400 E. Van Buren Street
Phoenix, Arizona 85004-2202
Telephone:   (602) 382-6000
E-Mail: mliburdi@swlaw.com

Michael T. Liburdi, Bar No. 021894
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Wesley W. Harris, *et al.*, | Case No. CV 12-0894-PHX-ROS |
| Plaintiffs, | **PLAINTIFFS' TRIAL BRIEF** |
| v. | Assigned to District Judges Silver and Wake and Circuit Judge Clifton |
| Arizona Independent Redistricting Commission, *et al.*, | Trial Date: March 25, 2013 |
| Defendants. | |

16812893

Pursuant to the order of December 21, 2012, Plaintiffs submit the following Brief for trial on the merits to be held March 25 - 29, 2013.

## I.  INTRODUCTION

Defendant Arizona Independent Redistricting Commission ("IRC") diluted Plaintiffs' votes deliberately, intentionally, and in violation of the one-person/one-vote principle of the Fourteenth Amendment in the legislative map ("Final Map") the IRC adopted on January 17, 2012, and Plaintiffs are entitled to judgment declaring the Final Map to be unconstitutional and void from the inception, permanently enjoining the IRC and Arizona Secretary of State from implementing or using the Final Map for any Arizona legislative elections, and permanently enjoining the IRC from ever again adopting a legislative map that dilutes the votes of any citizens of Arizona in violation of the Fourteenth Amendment.

Plaintiffs have alleged that the IRC engaged in

> systematically overpopulating Republican plurality districts and systematically underpopulating Democrat plurality districts with no lawful state interest justifying such deviations from equality of population among Arizona legislative districts.

Second Amended Complaint ("SAC") at ¶ 2.  See also id. at ¶ 160.  Thus, Plaintiffs are bound to prove only that no legitimate and constitutional state policy drove the population deviations.  As with differential diagnosis in medicine, if Plaintiffs prove no legitimate and constitutional state policy caused the population deviations, the ineluctable conclusion is that an unconstitutional motive caused the population deviations.

At trial, Plaintiffs will prove that a policy of increasing the Democratic Party's strength at the Legislature caused the population deviations, and that this is neither a legitimate nor a constitutional state policy in this context.  For this purpose, Plaintiffs

will focus primarily, though not exclusively, on Districts 8, 24, and 26.  Plaintiffs will further prove that the IRC majority (the voting bloc of Mathis-McNulty-Herrera) was biased from the start, that it shut out the two Republican members from any meaningful participation in substantive decision making, that it flouted state law procedural requirements, that it failed to perform the analysis required by Section 2 of the Voting Rights Act and *Thornburg v. Gingles*, 478 U.S. 30 (1986), to determine the number of majority-minority districts Section 2 would have required it to create, and that a Section 2 analysis, under Arizona's demographic conditions, would have prevented the District 8, 24, and 26 artifice.

For its part, the IRC has argued, in various court filings, in deposition testimony, and in the report submitted by Dr. Bruce Cain, that a desire to obtain preclearance from the Department of Justice ("<u>DOJ</u>") caused the population deviations, and that it created Districts 24 and 26 as crossover districts and District 8 as an opportunity district for preclearance purposes.  For example, the IRC set forth race as a justification for its systematic underpopulation and overpopulation of districts in its motion to dismiss the amended complaint (doc. 40), dated August 3, 2012, at 4:23-5:15, and in the proposed Case Management Plan (doc. 61) at 9:1-11.

Plaintiffs will prove that this justification was an artifice used to cover the IRC's efforts to strengthen Democratic Party representation at the Legislature, the precise practice Congress warned against in the Senate Report accompanying the 2006 reauthorization of the Voting Rights Act, P.L. 109-246, 120 Stat. 577 (July 27, 2006):

> Several House witnesses articulated the problem in clear terms: '[To] the extent that [we] can imagine that measures would be used to determine whether substantive representation or influence has been enhanced to prevent retrogression, these measures amount to simply helping Democratic Party candidates . . . Helping Democratic Party candidates would be argued to be equivalent to increasing minority voter influence and helping minority substantive representation.  In other words,

> influence districts, if seen as a replacement for opportunities for minority
> voters to elect representatives of their choice, would become simply a
> rationale for creating Democratic Party gerrymanders.'

S. Rep. 109-295 (July 26, 2006), at 19-20.  *See also Texas v. United States*, 831 F.Supp.2d 234, 268 n. 31 (D.D.C. 2011) ("*Texas I*") ("Indeed, a state's attempt to create future crossover districts may lead to the creation of 'influence' districts that *Georgia v. Ashcroft* approved and Congress rejected in the 2006 Amendments.")

This expressly is ***not*** a racial gerrymandering case.  If the IRC drew racially-gerrymandered districts, but did not violate the one-person/one-vote principle, Plaintiffs never would have filed this lawsuit.  Nonetheless, strict scrutiny should be applied to the extent that the IRC claims that racial motivations drove its deviations from population equality.  *Abrams v. Johnson*, 521 U.S. 74, 91 (1997); *Miller v. Johnson*, 515 U.S. 900, 904 (1995); *Shaw v. Reno*, 509 U.S. 630, 642-43 (1993).  But "compliance with federal antidiscrimination laws cannot justify race-based districting where the challenged district was not reasonably necessary under a constitutional reading and application of those laws."  *Miller*, 515 U.S. at 921.

At any rate, the facts expose the IRC's suggested racial justification as an artifice.  Comparing of the purposes of Section 5 to Section 2 shows how and why.

"The question of retrogressive effect under Section 5 looks at gains that have already been *realized* by minority voters and protects them from future loss."  *Texas I*, 831 F.Supp.2d at 262.  "[W]hen the number of districts remains the same or increases by one: there is no retrogression as long as the number of ability districts remains the same."  *Texas v. United States*, 887 F.Supp.2d 133, 157 (D.D.C. 2012) ("*Texas II*"). The number of Arizona legislative districts has remained constant at 30 for more than 40 years.  Thus, as detailed below, Section 5 would have required the IRC to draw no more than eight ability-to-elect districts to avoid retrogression from the Benchmark Plan,  the "last legally enforceable plan used by the jurisdiction[, which] serves as the

'benchmark,' or baseline for comparison in a Section 5 retrogression analysis." *Navajo Nation v. Ariz. Indep't Redistricting Comm'n*, 230 F.Supp.2d 998, 1004 (D. Ariz. 2002).

In contrast with Section 5, "Section 2 concerns itself with the possibility of a minority group's present, but *unrealized,* opportunity to elect." *Texas I*, 831 F.Supp.2d at 261. Thus, Section 2 would have focused on whether Arizona's increase in minority, and particularly Hispanic, population over the last decade would have required the creation of more ability-to-elect districts than what existed in the Benchmark plan.

Anomalously, the IRC never performed a *Gingles* analysis to determine the number of majority-minority districts Section 2 would have required it to create, if any, based on the increase in the percentage of minority, and particularly Hispanic, population experienced in Arizona over the last decade. Had the IRC done so, all districts it created to satisfy Section 2 would have had to have had minority CVAP exceeding 50% under *Bartlett v. Strickland*, 556 U.S. 1, 19 (2009).

While as a theoretical matter, Section 2 would not prohibit the use of coalition or crossover districts (defined below) for purposes of satisfying Section 5, *id.* at 25, as a practical matter, in Arizona's demographical circumstances, Section 5 and Section 2 would have overlapped, and all ability-to-elect districts would have required total minority CVAP exceeding 50%. There were not enough concentrations of minority voters to go around to allow crossover districts for Section 5 purposes while requiring 50% + 1 CVAP districts for Section 2. That would have stopped dead in its tracks the artifice of offering Districts 8, 24, and 26 as Hispanic or minority ability-to-elect or opportunity districts, when in fact they were created as Democrat ability-to-elect districts. The failure to perform the *Gingles* Section 2 analysis allowed the artifice to proceed, and presented the IRC with the means of dressing up Democratic districts in the guise of Voting Rights Act districts. Thus, shabby partisanship masqueraded as pure civil-rights efforts.

## II.   JURISDICTION AND VENUE

Jurisdiction is founded on 28 U.S.C. §§ 1331, 1367, 2201, 2202, 2284, and 42 U.S.C. § 1983.  Venue is proper in the District of Arizona under 28 U.S.C. § 1391.  A three judge-panel has been properly convened pursuant to 28 U.S.C. § 2284(a).

## III.   BURDEN OF PROOF

Plaintiffs have the burden of showing that population deviations from equality were arbitrary or discriminatory:

> If the maximum population deviation in a legislative apportionment plan is less than 10%, the burden shifts to the plaintiff to prove that the apportionment was arbitrary or discriminatory. To meet that burden, a plaintiff must show any deviation is an arbitrary or discriminatory policy. Further, the plaintiff must prove that the asserted unconstitutional or irrational state policy is the *actual reason* for the deviation.

*Harris v. Ariz. Indep't Redistricting Com'n*, 2012 WL 5835336, *3 (D.Ariz., Nov. 16, 2012) (Internal quotation marks and citations omitted, italics in original.)  If the IRC relies at trial on a defense that it drew the population deviations with a racial motive, the burden shifts and its plan is reviewed with strict scrutiny. *Miller*, 515 U.S. at  904.

## IV.   EVIDENCE TO BE OFFERED AT TRIAL

The evidence will consist primarily of testimony from the IRC commissioners, all of whom now have been deposed, Ken Strasma and Willie Desmond, the mapping consultants, Dr. Hofeller and Dr. Cain, the parties' respective experts, and Bruce Adelson, a lawyer-consultant to the IRC relative to Section 5 preclearance.  The exhibits will come primarily from the IRC's records and from the experts.

## V.   PLAINTIFFS' CASE

### A.   The *Larios v. Cox* Framework

The Fourteenth Amendment requires a State to make a good faith effort to achieve population equality among legislative districts.  *Roman v. Sincock*, 377 U.S. 695, 710 (1964).  Once a State has done so, it can adjust district boundaries to attain

other legitimate state interests, such as respecting county, city, and town lines, and communities of interest, or achieving compactness, contiguity or avoidance of contests among incumbents. *See Karcher v. Daggett*, 462 U.S. 725, 740 (1983) (identifying these as legitimate policies for deviation from equality in congressional plans); *Marylanders for Fair Representation, Inc. v. Schaefer*, 849 F.Supp. 1022, 1031 (D.Md. 1994) (applying *Karcher* to state legislative plans). Deviations from equality of district populations are permissible if they are the incidental results of State efforts to attain such policies. *Brown v. Thomson*, 462 U.S. 835, 842 (1983).

A state redistricting plan violates the Fourteenth Amendment when it employs population deviations for reasons other than to further a legitimate state interest. Such was the case in *Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga. 2004), *sum. aff'd by* 124 S. Ct. 2806 (2004). In *Larios*, a three-judge panel overturned the State of Georgia's legislative redistricting plan because it attempted to artificially strengthen rural representation at the expense of urban voters. *Id.* at 1353. In so doing, the court concluded that traditional redistricting criteria did not support the population deviations among the two sets of districts. *Id*. 1347-53. Application of the *Larios* framework to this case compels the same conclusion—that the population deviations in the IRC's legislative redistricting plan are designed to artificially support Democratic representation at the Arizona Legislature and ***do not*** further any legitimate state interest.

**B.    The *Arlington Heights* Lens**

*Roman v. Sincock* holds that a redistricting plan tainted with arbitrariness or discrimination violates the one-person/one-vote rule. 377 U.S. 695, 710 (1964). The disparate impact of the Final Plan on Republican-plurality and Democratic-plurality districts is obvious. As we noted in an earlier filing, when a quarter is flipped 17 times and comes up heads 16 of the 17 times, it is possible the pattern results from chance but it is not likely and one should check the quarter. That analogy harks back to *Village of*

*Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). *Arlington Heights* was a race case, and this is not, but its analysis of pattern and intent is instructive:

> Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face.

*Id.* at 266. Thus, under *Roman*, 377 U.S. at 710, the clear pattern leaves only whether it was the product of arbitrariness or discrimination. To this end, the *Arlington Heights* sets forth factors bearing on intent. *Id.* at 266. Relating them to this case, the IRC's biased selection of counsel and the mapping consultant, the freezing out of the Republican members from these and other decisions, the irregular departures from the State Procurement Code, which the IRC had elected to follow, the failure to follow the state public records laws, the failure to draw the grid map in accordance with ARIZ.CONST. art 4, pt. 2, § 1(14), the failure to perform a VRA Section 2 analysis, the pretextual use of Section 5, and the receipt of "guidance" from the Arizona Democratic Party's Elections Director in the map drawing all suggest string evidence of discriminatory intent. There will be other factors offered in evidence at trial. These show the wall of evidence being built of arbitrariness and discriminatory intent.

## C. The Voting Rights Stratagem

The Voting Rights stratagem in which putative voting rights districts serve as artifices for creation of Democratic districts is not new and is described in detail in the Senate Report accompanying Congress's 2006 reauthorization of the Voting Rights Act, P.L. 109-246, 120 Stat. 577 (July 27, 2006):

> If covered jurisdictions are permitted to break up districts where minorities form a clear majority of voters and replace them with vague concepts such as influence, coalition, and opportunity—a standard under which no one factor or specific combination of factors is determinative— this may actually facilitate racial discrimination against minority voters.

Particularly disconcerting is the prospect that the Georgia opinion [*Georgia v. Ashcroft*, 539 U.S. 461 (2003)] potentially opens the door to increased substitution of preferred candidate of choice. Several House witnesses articulated the problem in clear terms: "[To] the extent that [we] can imagine that measures would be used to determine whether substantive representation or influence has been enhanced to prevent retrogression, these measures amount to simply helping Democratic Party candidates . . . Helping Democratic Party candidates would be argued to be equivalent to increasing minority voter influence and helping minority substantive representation. In other words, influence districts, if seen as a replacement for opportunities for minority voters to elect representatives of their choice, would become simply a rationale for creating Democratic Party gerrymanders. "Prepared Statement of Theodore S. Arrington, Hrg. before the Subcommittee on the Constitution of the House Judiciary Committee 84 (Nov. 9, 2005).

However, as we learned from witnesses, this is not an acceptable result. Congressman Brooks made this point when he stated that ". . . retrogression would be something I could never accept. I would not ever sacrifice the full protections of section 5 . . . simply to promote a particular candidate or a political party. And I think that's basically what it came down to in 2001 in Georgia. We were putting political decisions ahead of what the Voting Rights Act really is all about, and I think we made a mistake." Testimony of Rep. Tyrone Brooks, Hrg. before the Subcommittee on the Constitution of the House Judiciary Committee 76 (Nov. 5, 2005). One House Member commented that the Georgia legislature "had made a partisan decision to basically protect Democratic districts, or the Democratic Party," and asked, "do you believe that that's an appropriate use of the Voting Rights Act?" Rep. Brooks responded, "No, I do not," and urged the Committee to accept the "preferred candidate of choice" language in order to prevent this result in the future.

S. Rep. 109-295 (July 26, 2006), at 19-20.

### D.     The Benchmark Plan

Recent Arizona redistricting history is instructive in defining the number of ability-to-elect districts in the Benchmark Plan. In 2002, the predecessor IRC made an initial submission to DOJ that DOJ declined to preclear. *Navajo Nation*, 230 F.Supp.2d at 1010. In that initial submission, the predecessor IRC noted that what then was the

1    Benchmark Plan, the "last legally enforceable plan used by the jurisdiction," *id.* at 1004
2    n. 8, had only eight ability-to-elect districts: seven Hispanic and one Native American.
3    *Id.* at 1010.  In its initial submission, the predecessor IRC identified ten ability-to-elect
4    districts, but DOJ objected to five of them, asserting that the IRC had not met its burden
5    with respect to them.  *Id.*

6           DOJ's objection to the 2002 IRC's initial submission did not leave enough time
7    for the predecessor IRC to draft and resubmit a replacement plan responding to DOJ's
8    objections.  As a result, the IRC and other parties asked this Court to draft an interim
9    plan for the 2002 election, which this Court did.  *Id*. at 1015-16.  The Court's 2002
10   interim plan identified eight ability-to-elect districts, and the 2002 legislative election
11   was conducted on that basis.  *Id.* at 1015.

12          Against this backdrop, the predecessor IRC revised its plan and resubmitted
13   under date of August 23, 2002.  Therein the IRC identified seven Hispanic ability-to-
14   elect districts (Districts 13, 14, 16, 23, 24, 25, and 27) and one Native-American ability-
15   to-elect district (District 2).  Under the DOJ's guidelines, 74 Fed.Reg.7470 (Feb. 9,
16   2011), the 2002 plan became the Benchmark Plan when loaded with 2010 census
17   population figures.  In its February 28, 2012, submission to DOJ, at p. 83, the current
18   IRC identified seven Benchmark ability-to-elect districts: District 2 as a Native-
19   American ability-to-elect district, and Districts 13, 14, 15, 16, 27, and 29 as Hispanic
20   ability-to-elect districts.  The divergence between the 2002 submission and the 2011
21   submission is explained by actual election results.

22          Regarding retrogression, the number of districts in a jurisdiction did not increase,
23   and in this case the number has remained constant at 30 for more than 40 years, "there is
24   no retrogression as long as the number of ability districts remains the same."  *Texas II*,
25   887 F.Supp.2d at 157.  In contrast, the function of Section 2 is to determine whether
26   population changes required the creation of additional ability-to-elect districts.  *Id.*  This

1    leads to a further significant distinction.  While as a theoretical matter, Section 2 would

2    not prohibit the use of coalition or crossover districts (defined below) for purposes of

3    satisfying Section 5, *id.* at 25, as a practical matter, in Arizona's demographical

4    circumstances, Section 5 and Section 2 would have overlapped, and all ability-to-elect

5    districts would have required total minority CVAP exceeding 50%.

6            This result would have prevented the creation of Districts 24 and 26 as putative

7    crossover districts and District 8 as an "opportunity" district.  Their creation goes

8    beyond compliance "with federal antidiscrimination laws" and is not justified by the

9    Voting Rights Act because these districts were not "reasonably necessary under a

10   constitutional reading and application of those laws."  *Miller*, 515 U.S. at 921.

11           In truth, Districts 24 and 26 are at best influence districts, and therefore do not

12   count towards satisfying Sections 2 or 5, and District 8 counts towards nothing so far as

13   satisfying any section of the Voting Rights Act is concerned.  An "influence district" is

14   one in which "a minority group is merely large enough to influence the election of

15   candidates but too small to determine the outcome."  *Pender County v. Bartlett*, 649

16   S.E.2d 364, 371 (N.C. 2007), *aff'd sub nom. Bartlett v. Strickland*, 556 U.S. 1 (2009).

17           Yet to dress up Districts 24 and 26 as putative ability-to-elect districts and

18   District 8 as an opportunity district, the IRC needed to rob minority populations from

19   the true Section 5 ability-to-elect districts (Districts 2, 3, 4, 7, 29, 27, 29, and 30) and

20   from other Districts (not necessarily ability-to-elect districts) to send such populations

21   through a ripple effect to Districts 24 and 26 and to District 8.  Districts 24 and 26 in

22   reality are Democrat districts.

23           A late trade-off occurred between District 8 and District 11.  The late switch

24   between District 8 and District 11 flipped party registrations in District 8, with

25   Republican Party registration dropping from 36.2% to 28.5% of total registration, and

26   Democratic Party registration increasing from 32% to 38%.  It also underpopulated

1   District 8, going from 3,262 over ideal to 4,873 under ideal.  The ostensible reason of

2   making District 8 a Voting Rights Act district makes little sense.  In its preclearance

3   submission to DOJ, the IRC identified ten ability-to-elect benchmark districts (in truth

4   there never were more than eight), in the proposed plan and seven in the Benchmark

5   Plan , and it already had created what it claimed to be ten ability-to-elect districts in its

6   evolving plan apart from District 8.  Thus, even if District 8 turned into a voting rights

7   district (which never happened), it could do nothing for Section 5 purposes.  It was

8   gilding the lily.

9           **E.      Bias of the Commissioners**

10          The IRC consists of four partisan-appointed members and a fifth commissioner,

11  who is selected by the four legislative appointments from the Appointment

12  Commission's third slate of candidates.  The third slate contains no Democrats or

13  Republicans.  The fifth commissioner serves as the chair of the IRC.  In this case, the

14  fifth commissioner was Colleen Mathis.

15          Colleen Mathis learned about the position of IRC chair at a convention for

16  Arizona L.I.S.T. that she and her husband Christopher Mathis attended in August 2010.

17  Arizona L.I.S.T. exists for the purpose of electing progressive and pro-choice

18  Democratic women to public office.

19          In response to the rules or practices of the Appointment Commission, Ms. Mathis

20  submitted an application to the Appointment Commission, dated October 12, 2010.

21  Therein Ms. Mathis omitted critical information, which, had it been known, would have

22  identified her as biased to the Democratic Party and not impartial, and would have

23  precluded her under article 4, part 2, § 1(3) of the Arizona Constitution from being

24  nominated to the IRC as an Independent or and from being selected to serve as the

25  Independent chairperson of the IRC.

26          Specifically, she failed to reveal the following:

1        a.      Christopher Mathis, her husband, served in the 2010 election as treasurer

2  for the campaign of Nancy Young Wright, a Democratic candidate for a seat in the

3  Arizona House of Representatives from legislative district 26 in Pima County;

4        b.      on May 16, 2010, she donated $100 to the campaign of Andrei Cherny,

5  then a democratic candidate for Arizona State Treasurer in the 2010 election;

6        c.      on May 4, 2010, Christopher Mathis donated $250 to the Cherny state-

7  treasurer campaign;

8        d.     on October 27, 2010, Christopher Mathis donated $100 to the Nancy

9  Wright legislative campaign;

10       e.      on August 10, 2010, she donated $10 to the Arizona List P.A.C., a

11  committee for pro-choice Democratic women in Arizona; and

12       f.      on March 3, 2010, Christopher Mathis donated $75 to Arizona List

13  P.A.C., and on August 10, 2010, donated another $10 to Arizona List P.A.C.

14       This consistent pattern of service to Democratic causes and patronage to

15  Democratic candidates reveals that Chairperson Mathis is an Independent in name only,

16  and in reality, sides with Democratic-oriented candidates and causes.

17       On February 24, 2011, in a meeting called by the Arizona Secretary of State, the

18  first four appointed Commissioners, constituting a quorum, met to select a chairperson

19  from among the five candidates who are not registered with either of Arizona's two

20  largest parties.

21       During the February 24, 2011, interviews, Commissioner Freeman indicated to

22  Ms. Mathis that the IRC's political appointee members were looking for a chairperson

23  who would bring balance and fairness to the IRC and asked Ms. Mathis whether

24  anything in her background would call into question her ability to be fair. According to

25  the minutes of this meeting, Ms. Mathis answered that "there is nothing in her

26  background that would limit her ability to be fair and as long as she did not have to

1   make decisions about buying heavy equipment she would be okay."  In response to

2   questioning from Commissioner McNulty about her management style, the meeting

3   minutes report that Ms. Mathis responded that she liked "to create an environment

4   where people feel they can trust her and are comfortable with what she is trying to do"

5   and that it was "important to be open and impartial and achieve the end result by

6   consensus."

7          This was an opportunity for Ms. Mathis to correct the material omissions she had

8   made on her application.  Instead, as disclosed by her interview answers, she doubled

9   down and continued to maintain a façade of impartiality.  Ms. Mathis later explained in

10  her deposition in this matter that she did not provide these details because she was not

11  asked about them directly and specifically.

12         Although they interviewed the five candidates and then met in closed session, the

13  Commissioners did not select a chairperson that day.  To allow time for further

14  reflection, the Commissioners decided to meet again on March 1, 2011.

15         On March 1, 2011, after meeting in closed session for a little over an hour,

16  Commissioners Freeman, Herrera, Stertz, and McNulty selected Ms. Mathis, a

17  registered Independent from Pima County, to serve as IRC Chair.

18         **F.    Selection of Counsel**

19         The alliance among Commissioners Mathis, McNulty, and Herrera first emerged

20  with the selection of the IRC's legal counsel.  After discussion about the IRC's

21  procurement authority and consultation with the State Procurement Office ("SPO") of

22  the Arizona Department of Administration, the IRC decided to follow the state

23  procurement code to retain legal services from one or more law firms.

24         On or about April 8, 2011, SPO issued a request for proposals ("RFP") for IRC

25  legal services.  Responses to the legal services RFP were due April 28, 2011.  On May

26  12, 2011, the IRC met in public session and interviewed six of the law firms that

16812893                                    13

responded to the legal services RFP with the goal of procuring the services of a Republican and a Democratic attorney.

At a public meeting on May 13, 2011, Commissioner Herrera indicated his preference for Democratic lawyer Michael Mandell.  In addition, Commissioners Freeman and Stertz indicated their preference for Republican lawyer Lisa Hauser. Accordingly, Commissioner Stertz moved that the IRC hire Mr. Mandell and Ms. Hauser as their counsel.  This motion was defeated by the voting bloc of Mathis-McNulty-Herrera, even though Commissioner Herrera had indicated his preference for Mr. Mandell just minutes before the vote was taken.

Following the defeat of Commissioner Stertz's motion, the Democratic Commissioners, McNulty and Herrera, and Chairperson Mathis, selected Republican counsel over the objections of the Republican Commissioners, Defendants Freeman and Stertz.  On this decision, the Mathis-Herrera-McNulty majority essentially isolated and shut out the Republican commissioners from the decision-making process and selected Osborn Maledon, P.A. (Democrat Mary O'Grady) and Ballard Spahr LLP (Republican Joseph Kanefield) as legal counsel.

The selection of Republican counsel against the wishes of the Republican members of the IRC set off a firestorm of controversy during public comment in subsequent meeting after meeting.  In summary, this first glimpse of the coalition of Mathis, McNulty, and Herrera raised concerns that the selection of counsel would foreshadow this coalition's commitment to something other than the application of the constitutional provisions in an honest, independent, and impartial fashion and other than upholding public confidence in the integrity of the redistricting process.

### G.    Selection of the Mapping Consultant

Further concerns emerged concerning the outcome-oriented nature of the scoring of the responses to the RFP engaged in by at least one Commissioner who gave perfect

1    scores to the Democratic Commissioners' preferred candidates and an unjustifiably low

2    score to the candidate preferred by the Republican Commissioners.   One other

3    Commissioner's written comments during the procurement process raised concerns

4    about the possibility that the scoring had been rigged.

5         Commissioners Mathis, McNulty, and Herrera discussed matters involving the

6    selection of legal counsel for the IRC, including having discussions that led to or were

7    the equivalent of legal action, outside of properly noticed public meetings.

8         Despite its stated intention of following the Arizona Procurement Code ("<u>APC</u>"),

9    the IRC failed to do so.  By letter dated June 29, 2011, Jean Clark at SPO withdrew

10   from further assistance to the IRC, and cited the following as instances in which the IRC

11   either failed to follow the APC or engaged in poor procurement practices:

12        1.    The IRC voted on the legal firm shortlist for interviews without

13   involvement by the Procurement Officer.  The Procurement Officer was excluded from

14   attendance and was not afforded an opportunity to provide supporting evaluation

15   documentation for the shortlist decision.   Further, the IRC failed to provide the

16   Procurement Officer the opportunity to review the interview questions or prescribe the

17   guidelines for the interviews.  (R2-7 -C316B, Evaluation of Offers) .

18        2.    The IRC agreed and signed a legal services summary evaluation report,

19   but then publicly discussed and some members voted contradictory to the agreed upon

20   evaluation report.  (R2-7 -C316B, Evaluation of Offers).

21        3.    The IRC directed SPO to "harmonize" the rates between the two firms,

22   which required a non-susceptible award determination after the public vote so the rates

23   could be negotiated.  This did not follow the customary process or requirements in the

24   APC for negotiations and final proposal revisions.  (A.R.S. §41-2534F; R2-7- C311A,

25   Determination of Not Susceptible for Award).

26

4.     The IRC disregarded a recommendation by SPO that the composition of the evaluation committee for the mapping RFP include independent subject matter experts and not be solely comprised of Commissioners. (R2-7-C316B, Evaluation of Offers).

5.     The IRC disregarded the Procurement Officer's instruction to submit their preliminary interview questions for review prior to the mapping consultant interviews. (R2-7-C313C, Clarifications of Offerors).

6.     The IRC disregarded the Procurement Officer's instructions to evaluate strictly upon the evaluation factors in the RFP and to be consistent; however, inconsistencies were evident in the evaluator comments and scoring for the mapping consultant. (R2-7 -C316B, Evaluation of Offers).

7.     The IRC failed to comply with the APC in the evaluation of the proposals. In particular in the determination of susceptibility/competitive range and ultimate contract award.   (A.R.S. § 41-2534F; R2-7 -C314C, Negotiations with Responsible Offerors and Revisions of Offers).  As discussions also transpired in Executive Session, other aspects of the Arizona Procurement Code may be in question.

On or about June 15, 2011, the IRC met in public session to select four candidates to interview for the position of mapping consultant: Strategic Telemetry, National Demographics, Research Advisory Services, and Terra Systems.   Before making their selection, the IRC held one or more closed sessions to discuss the selection of a mapping consultant, including an almost five-hour closed session on June 15, 2011.

The mapping consultant RFP evaluation form criteria included two categories that were scored by the commissioners: methodology for performance of work (400 points) and capacity of offeror (300 points).  The other two categories, cost (200 points) and conformance with T's and C's (100 points), were completed by the State Procurement Office.

Following presentations by the candidates for mapping consultant on June 24, 2011, the IRC met in closed session to discuss the selection of the mapping consultant and Chairperson Mathis and Commissioners McNulty and Herrera all gave Strategic Telemetry perfect scores for the methodology and performance of work and capacity of offeror (700 points).

Commissioners Mathis, McNulty, and Herrera all gave Strategic Telemetry perfect scores despite its relative lack of redistricting experience, its lack of even rudimentary knowledge of Arizona demographics and geography, its submission of the most expensive proposal, its being headquartered at the District of Columbia, and its deep ties to Democratic candidates and organizations.

By a vote of 3-2, on June 29, 2011, the Commission selected Strategic Telemetry as its mapping consultant.  Chairperson Mathis again joined with the Democratic commissioners who favored retention of the Democratic-aligned consultant against Commissioners Stertz and Freeman.

On this decision as well, the Mathis-Herrera-McNulty majority again isolated and shut out the Republican commissioners from the decision-making process.

Throughout this selection process, concerns were voiced by the public and Commissioners Stertz and Freeman about Strategic Telemetry's highly partisan, pro-Democratic resume.  Strategic Telemetry advertised itself as a statistics and data analysis firm that caters to Democratic clients.

As a Democratic campaign strategist, Strategic Telemetry's President, Ken Strasma, specialized in microtargeting and is considered to be a pioneer in the use of high-tech statistical modeling in Democratic campaigns.  Mr. Strasma, served as the national target director for the 2008 Obama presidential campaign.  His work for the 2008 Obama campaign included micro-targeting, a technique for identifying narrow niches of voters and targeting campaign communications to them.  He also worked with

the 2004 John Kerry presidential campaign and directed its micro-targeting efforts. Most recently, he worked on efforts to recall Republican officials in Wisconsin.  Mr. Strasma also has a long history of making substantial monetary contributions to Democratic candidates.

The fact that Strategic Telemetry is not a mapping firm was highlighted during an IRC meeting in July 2011 when Strategic Telemetry indicated that its staff would need time to learn the Maptitude software that is standard in the mapping industry.

**H.    Failing to Follow the State Constitution Regarding the Grid Map**

On August 18, 2011, the IRC approved its option 2 legislative grid map (the "Grid Map"), thereby completing Phase 1 of its constitutionally mandated work.  The grid map had a maximum overpopulation deviation of 1.56% and a maximum underpopulation deviation of 2.51%.  In that respect, the Grid Map failed to comply with Ariz. Const. art. 4, pt. 2, § 1(14), which required the Grid Map to consist of districts of equal population as the start point of the map drawing process.  Thus, the IRC was already off on the wrong foot.

**I.    Failing to Turn Square Corners**

The IRC did not adopt a definition of community of interest as that term is used in article 4, part 2, § 1(14) of the Arizona Constitution. The IRC did not adopt a definition of compactness or contiguity as those terms are used in article 4, part 2, § 1(14) of the Arizona Constitution.   The IRC did not adopt a definition of competitiveness as that term is used in article 4, part 2, § 1(14) of the Arizona Constitution.

The Arizona Constitution does not require the IRC to take such actions, but the absence of them indicates that these neutral criteria could not have driven any of the population deviations, except in an arbitrary fashion.  If the IRC could not define any of

1   the neutral criteria, it is highly unlikely that they served to cause population deviations.

2   The lack of definitions afforded the cover of pretext.

3       **J.      The McNulty Legislative Draft Map**

4           On October 10, 2011, the IRC approved a draft legislative map (the "Draft

5   Map").   The Draft Map was supposed to have been a "Merge Map," meaning a

6   combination of the maps then preferred by Commissioner McNulty for Southern

7   Arizona and by Commissioner Freeman for Northern Arizona.  In fact, it was essentially

8   a map drawn by Commissioner McNulty.  The Republican members of the IRC again

9   were frozen out of the process.

10          Immediately after approving the Draft Map, the IRC put the map out for stage-

11  three public comment.  The effect of the IRC's publishing the draft map at the end of

12  stage 2 of the process was to represent to the people of Arizona that the Draft Map was

13  a good faith effort to satisfy the six criteria set forth in art. 4, pt. 2, § 1(14) of the

14  Arizona Constitution.  Yet not having had any racial bloc voting analyses performed

15  either for Section 5 or Section 2, the IRC was at best guessing that its minority districts

16  in fact formed ability-to-elect districts.

17      **K.      Ignoring the Legislature's Comments**

18          On November 2, 2011, during the stage-three comment period, the Arizona

19  Legislature passed House Concurrent Memorial 2001, making comments on the

20  legislative draft map pursuant to art. 4, pt. 2, § 1(14), of the Arizona Constitution.  The

21  IRC completely ignored these comments.

22      **L.      Reconvening on November 29, 2011**

23          After the 30-day comment period elapsed, the Commission reconvened and met

24  on the following dates:  November 29 and 30, and December 1, 5, 7, 8, 9, 12, 15, 16, 19,

25  20, 2011, and January 9, 10, 13, and 17, 2012.

26          At the first meetings concerning adjustments to the draft map, held on November

1    29 and 30, 2012, the IRC received advice from its voting rights consultant, Bruce

2    Adelson, that it could under-populate Voting Rights Districts relative to other districts

3    to help ensure that the map would not retrogress and would meet the Commission's

4    burden under Section 5 of the Voting Rights Act.

5              At the same meetings, a draft racial bloc voting analysis, prepared by Dr. Gary

6    King, was presented to the IRC.  It identified Districts 2, 3, 4, 7, 19, 24, 26, 27, 29, and

7    30 as all ability-to-elect districts for Section 5 retrogression purposes.  It also identified

8    ten ability-to-elect districts in the benchmark plan.

9              The latter point in Dr. King's report was error.  The IRC later acknowledged in

10   its submission to DOJ that two of the putative ability-to-elect districts in the Benchmark

11   Plan in fact never elected the minority-preferred candidate and that two rarely did.

12             Dr. King provided no information to the IRC on any discrete improvements, if

13   any, the IRC needed to make to the ten identified ability-to-elect districts.

14             Thus, the IRC never knew how much, if at all, it needed to improve any of the

15   districts in the draft map labeled as ability-to-elect districts.

16   **M.    The Draft Map and Preclearance**

17             By November 29, 2011, Dr. King's racial bloc voting analysis showed that the

18   IRC in fact had achieved eight ability-to-elect districts, even though it had been

19   proceeding anecdotally at best.  These were Districts 2, 3, 4, 7, 19, 27, 29, and 30.  At

20   that point, these eight districts were adequate to equal the Benchmark Plan.  So far as

21   Section 5 was concerned, the IRC could have quit there and would have been ahead.

22   **N.    Robbing Majority-Minority Districts**

23             Despite the fact that its legislative plan achieved the necessary eight ability-to-

24   elect districts to avoid retrogression, between November 29, 2011, and January 17,

25   2012, the IRC proceeded to convert Districts 24 and 26 into as strong Democratic-

26

plurality districts as it could.  To do so it underpopulated other Democratic-plurality districts and overpopulated other Republican-plurality districts.

This chart shows how the Final Legislative Map made adjustments to the ability-to-elect districts as these districts were configured in the Draft Map:

| Dist. | Population | Deviation from Ideal | Population Change | Draft HVAP % | Final HVAP % | HVAP Change |
|---|---|---|---|---|---|---|
| 2 | Draft  212,863<br>Final  204,615 | Draft  -204<br>Final -8452 | ↓8248 | 61.4% | 52.8% | ↓9.6% |
| 3 | Draft  210,016<br>Final  204,613 | Draft  -3051<br>Final -8454 | ↓5403 | 51.2% | 50.1% | ↓1.1% |
| 4 | Draft  214,082<br>Final  204,143 | Draft  +1014<br>Final -8924 | ↓9938 | 53.7% | 55.7% | ↑2.0% |
| 19 | Draft  212,096<br>Final  207,088 | Draft  -971<br>Final -5979 | ↓5008 | 60.0% | 60.4% | ↑0.4% |
| 24 | Draft 213,582<br>Final 206,659 | Draft  + 514<br>Final  - 6,408 | ↓ 6,922 | 31.8% | 34.1% | ↑2.3% |
| 26 | Draft 213,247<br>Final 213,659 | Draft + 179<br>Final + 591 | ↑ 412 | 30.4% | 32.0% | ↑1.6% |
| 27 | Draft 208,413<br>Final 204,195 | Draft  -4654<br>Final -8872 | ↓4218 | 53.7% | 52.1% | ↓1.6% |
| 29 | Draft  212,258<br>Final  211,067 | Draft  -809<br>Final -2000 | ↓1191 | 61.7% | 61.9% | ↑0.2% |
| 30 | Draft  207,918<br>Final  207,763 | Draft  -5149<br>Final -5304 | ↓155 | 50.7% | 50.7% | —— |
| 7[1] | Draft  210,314<br>Final  203,026 | Draft  -2753<br>Final -10,041 | ↓7288 | 61.9% | 63.1% | ↑1.2% |

[1] District 7's VAP percentages are Native American, rather than Hispanic.

**O.     The Final Map**

On January 17, 2012, the IRC adopted its Final Legislative Map.  Commissioners Mathis, McNulty, and Herrera voted in favor and Commissioners Stertz and Freeman voted against.  The IRC systematically under-populated Republican plurality districts and over-populated Democratic plurality districts for the sole purpose of providing Democratic candidates with a partisan advantage that would not otherwise be attainable had the IRC tried to achieve population equality with deviations based solely on traditional redistricting principals and legitimate state policies.

To the extent that the IRC claims that it systematically overpopulated Republican plurality districts and systematically under-populated Democrat plurality districts for the purpose of complying with Section 5 of the Voting Rights Act, such alleged compliance is pretextual and masks the IRC's true purpose of maximizing the strength of the Democratic Party at the Legislature.

The Final Legislative Map made the following adjustments in terms of party registration to the following LDs from their configurations in the Draft Map:

**Changes in Party Registration Percentages in Selected Districts**

**Draft Map to Final Map**

| District | Draft Republican Registration | Final Republican Registration | Draft Democratic Registration | Final Democratic Registration |
|---|---|---|---|---|
| 2 | 20.7 | 24.5 | 46.0 | 42.3 |
| 3 | 18.2 | 17.7 | 49.9 | 50.1 |
| 4 | 26.4 | 24.5 | 38.6 | 40.4 |
| 6 | 38.4 | 37.8 | 29.0 | 29.0 |
| 7 | 19.0 | 19.3 | 53.6 | 53.8 |
| 8 | 36.2 | 28.5 | 32.0 | 38.1 |
| 9 | 33.1 | 33.2 | 36.9 | 37.0 |

| District | Draft Republican Registration | Final Republican Registration | Draft Democratic Registration | Final Democratic Registration |
|---|---|---|---|---|
| 10 | 33.0 | 33.5 | 37.5 | 37.0 |
| 19 | 19.6 | 19.8 | 40.1 | 39.9 |
| 24 | 25.3 | 24.8 | 38.4 | 39.1 |
| 26 | 27.6 | 25.8 | 32.4 | 33.0 |
| 27 | 14.8 | 14.6 | 47.6 | 47.8 |
| 29 | 21.5 | 21.5 | 39.4 | 39.5 |
| 30 | 24.0 | 24.0 | 38.6 | 38.6 |

The 2012 general elections showed the following results in the following districts:

**Arizona Legislative District Minority Performance
2012 General Election**

| District | Senate | House |
|---|---|---|
| 2 | Lopez (D) | Dalessandro (D) Gabaldon (D) |
| 3 | Cajero Bedford (D) | Gonzalez (D) Saldate (D) |
| 4 | Pancrazi (D) | Escamilla (D) Otondo (D) |
| 7 | Jackson (D) | Hale (D) Peschlacai (D) |
| 19 | Tovar (D) | Cardenas (D) Contreras (D) |
| 24 | Hobbs (D) | Alston (D) Campbell (D) |
| 26 | Ableser (D) | Mendez (D) Sherwood (D) |
| 27 | Landrum (D) | Gallego (D) Miranda (D) |
| 29 | Gallardo (D) | Hernandez (D) Quezada (D) |
| 30 | Meza (D) | Larkin (D) McCune-Davis (D) |

**P.    The Neutral Criteria**

None of the neutral criteria of respecting county, city and town lines, respecting communities of interest, compactness, or competitiveness drove any of the population deviations.  The 2012 legislative map split county, city, and town lines more than 400 times.  Having never adopted a definition of communities of interest, the IRC was unable to afford much respect for this constitutional criterion.  The 2012 legislative map created at most three competitive districts, three fewer than the predecessor IRC created.

The IRC selectively and arbitrarily applied the concept of communities of interest to certain mapping decisions.  For example, the IRC ignored several requests by residents that the IRC apply the community of interest criteria to their region:

a.    The IRC ignored the request of the residents of the Town of Show Low to be kept in LD 6 with the community of Snowflake.  The IRC instead placed this community in LD 7, specifically against the Show Low residents' wishes.  The Town of Show Low is located on the boundary between LDs 6 and 7.

b.    The IRC ignored the request of the residents in the Summerhaven community on Mt. Lemmon.  These residents asked the IRC to place them in a legislative district with the City of Tucson.  Instead, they were placed in LD 14, which is predominantly Cochise, Graham, and Greenlee Counties.  The Summerhaven residents are located on the western edge of LD 14 and separated from the rest of the district by the Coronado National Forest.

c.    The IRC ignored the request of the City of Glendale to be placed in as few legislative districts of possible.  Instead, the City of Glendale was divided among five legislative districts.

d.    The IRC ignored the request of the Pinal County Association of Governments to keep Pinal County in one or two legislative districts.  Also, the City of

1  Casa Grande asked that they be preserved in one district.  Instead, the IRC divided it
2  into four legislative districts and split the City of Casa Grande into two.

3  **VI.  CONCLUSION**

4        Not compelled or justified by any legitimate state interest, such as compliance
5  with the Voting Rights Act, or the neutral districting criteria, the IRC's systematic
6  overpopulating of Republican-plurality districts and systematic under-populating of
7  Democratic-plurality districts was arbitrary and discriminatory, denied Plaintiffs, and
8  each of them, their rights to equal protection of the laws guaranteed by the Fourteenth
9  Amendment to the United States Constitution, and deprived them of "rights, privileges,
10  or immunities secured by the Constitution and laws" of the United States, in violation
11  of 28 U.S.C. § 1983 and *Larios v. Cox*, 300 F.Supp.2d 1320, 1341 (N.D. Ga. 2004).

13        **RESPECTFULLY SUBMITTED** on March 18, 2013.

14                      **CANTELME & BROWN, P.L.C.**

16                      By:   s/   David J. Cantelme, SBN 006313
                    3003 N. Central Avenue, Suite 600
17                      Phoenix, AZ 85012
                    Tel (602) 200-0104
                    Fax (602) 200-0106
18                      E-mail:  djc@cb-attorneys.com

20                      **SNELL & WILMER L.L.P.**

21                      By:   s/   Michael T. Liburdi, SBN 021894
                    One Arizona Center
22                      400 E. Van Buren Street
                    Phoenix, Arizona  85004-2202
23                      Telephone:   (602) 382-6000
                    Fax: (602) 382-6070
24                      E-Mail:  mliburdi@swlaw.com
                    *Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 18, 2013, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a notice of electronic filing to the EM/ECF registrants appearing in this case.


  s/  Samuel Saks
Samuel Saks

16812893

26