Joseph A. Kanefield (015838)
Brunn W. Roysden III (028698)
Colleen M. Reider (027260)
BALLARD SPAHR LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone: 602.798.5400
kanefieldj@ballardspahr.com

Colin F. Campbell (004955)
Mary R. O'Grady (011434)
Jeffrey B. Molinar (018512)
Joseph N. Roth (025725)
OSBORN MALEDON, P.A. (00196000)
2929 North Central Avenue, Suite 2100
Phoenix, Arizona  85012-2793
Telephone: 602.640.9000
ccampbell@omlaw.com, mogrady@omlaw.com, jmolinar@omlaw.com

*Attorneys for the Arizona Independent Redistricting Commission*

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone: 602.798.5400

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Wesley W. Harris, *et al.*,<br><br>    Plaintiffs,<br><br>    vs.<br><br>Arizona Independent Redistricting Commission, *et al.*,<br><br>    Defendants. | No.: 2:12-CV-00894-ROS-NVW-RRC<br><br>**DEFENDANT'S TRIAL BRIEF**<br><br>**TRIAL DATE:**<br><br>**March 25-29, 2013**<br><br>(Assigned to three-judge panel) |

The Arizona Independent Redistricting Commission hereby provides its trial brief to assist the Court.  Consistent with the Court's Rule 16 Scheduling Order (Doc. 83), the Commission is simultaneously submitting proposed findings of fact and conclusions of law.  Plaintiffs have confused the issues and relevant legal standard that govern the claim made in their Second Amendment Complaint.  This trial brief is intended to set forth the proper legal standard and, along with the proposed findings of fact and conclusions of law, demonstrate why Plaintiffs cannot prevail.

## I.    <u>INTRODUCTION</u>

The 2010 redistricting process took place over hundreds of hours of public meetings at which the five citizen-volunteer commissioners drafted the legislative

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone: 602.798.5400

districts that would be used for election of state legislators in Arizona through 2020.  No line was drawn and no district set except those viewed, considered, and subjected to public comment at public meetings.  As with most legislative processes, the commissioners did not unanimously agree to all aspects of the redistricting plan.  There were many consensus changes, and there were split votes during the course of approval of the new districts.  Plaintiffs, however, perceive that the legislative process did not go exactly as they prefer and are doing all they can to undo the redistricting plan and undermine the voter-approved Commission's legitimacy along the way.

Some of the legislative districts deviate from strict population equality.  Because the maximum population deviation is less than 10%, however, the apportionment plan is presumptively constitutional.  Plaintiffs therefore have the burden to "show[] that the deviation in the plan results *solely* from the promotion of an unconstitutional or irrational state policy." *Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 365 (S.D.N.Y.) (citation omitted), *summarily aff'd*, 543 U.S. 997 (2004).  Plaintiffs also have the burden to show that an improper purpose was the actual reason for the minor population deviations.  *Id.*

To make their case, Plaintiffs have alleged that partisan advantage motivated the population deviations and that partisan advantage is not a rational state policy.  The record tells a different story.  It is evident that districting decisions in the relevant districts were motivated by legitimate state policies, including the Commission's concern for communities of interest, competitiveness, and the Commission's effort to ensure compliance with the Voting Rights Act ("VRA").  As discovery proceeded and it became clear that the facts undermined their claim, Plaintiffs abandoned their partisanship theory (without amending the complaint) and shifted theories to try to make this case a referendum on how the Commission complied with the VRA, arguing that the Commission's efforts were a "ruse" to cover up partisan intent.  The assertion of compliance with the VRA does not trigger strict scrutiny.  And for the reasons described below, Plaintiffs' claim fails as a matter of law and fact.  The Commission acted on several rational state policies that support the population deviations in this case.

A "partisanship" claim is not a justiciable claim when the population deviations are minor for the reasons asserted in its Motion to Dismiss (Doc. 40), the reasons articulated by the plurality in *Vieth v. Jubelirer*, 541 U.S. 267, 305 (2004) (plurality concluding that political gerrymandering claims are non-justiciable), and Justice Scalia's dissent from summary affirmance in *Cox v. Larios*, 542 U.S. 947, 949 (2004).   But assuming a bare partisanship claim is justiciable, the facts simply do not support the claim that "bare partisan advantage" motivated the Commission's districting decisions. (*See* Order on Mot. to Dismiss, Doc. 54 at 5.)   Plaintiffs' own expert, who is (and has long been) on the payroll of the Republican National Committee, admitted that "the necessity to comply with the Voting Rights Act and some of the criteria that are in the Arizona Constitution would make "a markedly different result more difficult."   (Hofeller 2/16/2013 Dep. Tr. at 267:13-16.)   Nor can Plaintiffs show that the districting plan actually had such an effect.   Indeed, Commissioner Stertz said that "[t]o my nonexpert layman's view, I believe that this map will cause the [Arizona] house and the senate to remain in Republican control through 2020."   (Commission's Proposed Findings of Fact ("Findings of Fact") ¶ 117.)

In other words, this case is nothing like *Larios v. Cox*, the primary case on which Plaintiffs have relied.   In *Larios*, the Georgia legislature used improper means (geographic regionalism and protection for *certain* incumbents and not "incumbents as such") to entrench itself as the majority in the legislature, even though the election results demonstrated it was the political minority.   *Cox*, 542 U.S. at 949 (Stevens, J., concurring).   And in that case, the state took the position that it could exploit the 10% border as an unimpeachable safe harbor.   *Larios v. Cox*, 300 F. Supp. 2d 1320, 1341 (N.D. Ga.) ("[I]t is quite apparent . . . that legislators and plan drafters made a concerted effort to contain populations to +/- 5%, and no further . . . ."), *summarily aff'd*, 542 U.S. 947 (2004).   That is simply not the case here.   The fact that some on the political spectrum are displeased with the outcome of a legislative process is inevitable, not unconstitutional.

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone: 602.798.5400

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone: 602.798.5400

1   Therefore, as further described in the proposed findings of fact and conclusions of

2   law, Plaintiffs will not be able to meet their burden that the *actual* reason for the

3   population deviations is improper partisanship or that the Commission otherwise acted

4   for an improper purpose when it approved a map with minor population deviations

5   among districts.

6   **II.    LEGAL STANDARDS**

7          **A.    Plaintiffs Must Prove that the Population Deviations are *not* Based
8                 upon Legitimate Considerations Incident to a Rational State Policy and
                   that the Asserted Unconstitutional or Irrational Policy is the *Actual*
9                 Reason for the Deviations.**

10   Federal law affords the State of Arizona flexibility in constructing legislative

11   districts.  *E.g.*, *Voinovich v. Quilter*, 507 U.S. 146, 156, 161 (1993).  Strict mathematical

12   equality among district populations has never been required.  *E.g. Mahan v. Howell*, 410

13   U.S. 315, 322 (1973).   Instead, the standard has been referred to as the "goal of

14   substantial equality."   *Brown v. Thomson*, 462 U.S. 835, 845 (1983) (citation omitted).

15   Moreover, it is well established that plans "with a maximum deviation under 10% fall

16   within [the] category of minor deviations."  *Voinovich*, 507 U.S. at 161 (quoting *Brown*,

17   462 U.S. at 842-43).   The state need not be forced to justify a reapportionment plan

18   unless the plan has "larger disparities in population" than 10%.  *Brown*, 462 U.S. at 842-

19   43.   And even then, the standard is a deferential one under which the state must show

20   only that its plan "may reasonably be said to advance a rational state policy and if so

21   whether the population disparities among the districts that have resulted from the pursuit

22   of this plan exceed constitutional limits."   *Id*. at 843 (internal quotation marks and

23   citation omitted).

24   The standard is necessarily deferential because intervention in reapportionment is

25   "a serious intrusion on the most vital of local functions."   *Miller v. Johnson*, 515 U.S.

26   900, 915 (1995).  Caution is especially necessary here because "[a] decision ordering the

27   correction of all election district lines drawn for partisan reasons would commit federal

28   and state courts to unprecedented intervention in the American political process."  *Vieth*,

4

541 U.S. at 306 (Kennedy, J., concurring) (agreeing with plurality that standards for determining whether lines are unconstitutionally partisan are unworkable and concurring in dismissal of political gerrymandering claim).

The Supreme Court has carefully observed and reinforced these principles of federalism and judicial restraint in this context.  Even when the population disparities are extreme when compared to the minor deviations in this case, the Court has left plans in place.  *See Brown*, 462 U.S. at 843-44 (affirming plan in which county seat was underpopulated by 60% below the mean).  And in *Larios*, the only case overturning statewide maps with minor population deviations, the Supreme Court summarily affirmed only when the district court concluded that the legislature had intentionally abandoned traditional districting principles and treated the 10% as an unimpeachable safe harbor within which the legislature engaged in plainly discriminatory districting decisions. *Larios*, 300 F. Supp. 2d at 1341-42; *see also LULAC v. Perry*, 548 U.S. 399, 423 (2006) (opinion of Kennedy, Souter, and Ginsburg) (noting that in *Larios* "the plans were 'plainly unlawful' and any partisan motivations were 'bound up inextricably' with other clearly rejected objectives" (citation omitted)).

In this case, the maximum population deviation is 8.8%.  Accordingly, the Court must presume that the population deviations are the result of an "honest and good faith effort to construct districts . . . as nearly of equal population as is practicable."  *Daly v. Hunt*, 93 F.3d 1212, 1220 (4th Cir. 1996) (citation omitted).  This presumption is only strengthened by the fact that the average population deviation is low – only 2.26%.  *See, e.g.*, *White v. Regester*, 412 U.S. 755, 764 (1973); *Gaffney v. Cummings*, 412 U.S. 735, 737 (1973).  To rebut the presumption, Plaintiffs must prove:

(a)   That the population deviations are an arbitrary or discriminatory policy; that is, the population deviations are not based upon legitimate considerations incident to the effectuation of a rational state policy.  *E.g.*, *Rodriguez*, 308 F. Supp. 2d at 365.

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone: 602.798.5400

5

(b)     That the asserted unconstitutional or irrational state policy is the actual reason for the deviation. *Id.*

(c)     Where partisanship is alleged as the sole reason for diverging from population equality, that the population deviations result in an actual partisan effect. *See, e.g.*, *Vieth*, 541 U.S. at 315 (Kennedy, J., concurring).

Given this highly deferential standard, the Commission has wide discretion on how best to apply the competing legitimate state policies that go into a redistricting determination. *Wise v. Lipscomb*, 437 U.S. 535, 539 (1978) ("[R]edistricting . . . legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt.").

### B.     Population Deviations Incident to Efforts to Ensure Compliance with the VRA Are Legitimate, Rational State Actions and Do not Trigger Strict Scrutiny.

When the Commission met several times to make adjustments to the draft map and bring it to final, the Commission found that the map needed adjustments to ensure compliance with Section 5 of the VRA, which prohibits any change to any "standard, practice, or procedure with respect to voting that has the purpose of or will have the effect of diminishing the ability" of the minority populations' ability to elect candidates of choice. *See* 42 U.S.C. § 1973c(b).

Compliance with federal law such as the VRA is unquestionably a rational and legitimate state interest. *Cf. Bush v. Vera*, 517 U.S. 952, 977 (1996) (assuming without deciding that compliance with VRA would be a compelling state interest). The Voting Rights Act requires the State of Arizona to obtain pre-clearance from the Department of Justice before making redistricting changes. To obtain pre-clearance, the Commission had to make a functional analysis of how many Voting Rights Act districts should be drawn in Arizona. Both Plaintiffs' and Defendant's experts agree that this determination is required. (*See* Expert Report of Bruce E. Cain ("Cain Report") (Ex. 547) ¶ 10 (citing 2011 DOJ Redistricting Guidelines, 76 Fed. Reg. 7470 (Feb. 9, 2011) (Ex. 583)); Hofeller 2/16/2013 Dep. Tr. at 227-29; *Texas v. United States* (*Texas II*), 887 F. Supp.

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone: 602.798.5400

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone: 602.798.5400

2d at 133, 140 (D.D.C. 2012) ("[E]nsuring that a proposed plan will not undo the gains minority voters have achieved in electoral power requires a multi-factored, functional analysis").

The functional analysis required by the Department of Justice is set forth in the Federal Register.  2011 DOJ Redistricting Guidelines, 76 Fed. Reg. 7470 (Feb. 9, 2011) (Ex. 583).  A viable Voting Rights Act district requires the Commission to establish a district where the minority has the ability to elect its candidate of choice.  A minority candidate of choice can be a candidate who is a member of the minority, or a member of another group.  *Thornburg v. Gingles*, 478 U.S. 30, 67-68 (1986).

The Commission made a judgment, based upon a functional analysis, to create ten Voting Rights Act districts.  Eight of the districts were majority-minority districts and two of the districts were coalition districts.  To enhance the ability to elect of the minority or minority coalition in these districts, the Commission made small population adjustments.  The enhancement of the ability to elect was measured by statistics and indexes based upon prior election results.  Dr. Gary King confirmed in his analysis, which was submitted to the DOJ, that all of these districts were districts where the minority or a minority coalition could elect candidates of choice.  (*See* Findings of Fact ¶¶ 82-92, 102, 106-07.)

The State's interest in preclearance is significant.  In the event of an objection, the State would probably not have had new districts in place for the 2012 election, necessitating emergency relief from the courts and perhaps a court-drawn plan for at least one election cycle.  Also, if the State receives an objection, it is ineligible to bail out from under Section 5 for ten years.  42 U.S.C. § 1973b(a).  By reason of the Commission's work, the State of Arizona received pre-clearance on its first submission to the Department of Justice.  This reasoned effort to comply with the VRA, in addition to other legitimate purposes discussed below, renders Plaintiffs incapable of meeting their burden to show that partisanship was both an improper purpose and that partisanship was ***the sole*** purpose for the population deviations.

1.   **Plaintiffs' Arguments That the Commission's Efforts to Comply with the VRA Were Illegitimate Are Wrong.**

Plaintiffs argue that the Commission's efforts to ensure compliance with Section 5 of the VRA do not justify any of the population deviations for various reasons. Plaintiffs first argue that compliance with the VRA *per se* does not justify underpopulations. (*See* Joint Pretrial Order ("JPTO") at p. 29-31.) Failing that, Plaintiffs contend that compliance with the VRA can only justify deviations from strict population neutrality if the deviations satisfy strict scrutiny. (*Id*. at 31-34.) Finally, Plaintiffs argue that the Commission's efforts to comply with the VRA would fail strict scrutiny because the Commission could not legitimately create so-called "coalition" districts or create more ability to elect districts than is minimally required. (*See id*. at 15, 31-34; Response to Mot. for Judgment on Pleadings, Doc. 105 at 6-7.)

Plaintiffs are wrong. The deferential standard set forth above applies and efforts to comply with the VRA qualify as a legitimate purpose for state action. Strict scrutiny does not apply to Plaintiffs' claim and Plaintiffs lack standing to assert a claim to which strict scrutiny would apply. Thus, whether any specific deviation would satisfy strict scrutiny is not relevant to whether Plaintiffs can carry their burden to show that deviations were done for an illegitimate, arbitrary and discriminatory purpose.

(a)   *Compliance with the VRA Is a Legitimate Basis for a Minor Population Deviation.*

Plaintiffs contend that compliance with the VRA *per se* does not justify underpopulations because the "Fourteenth Amendment is not at war with itself." (JPTO at 29 (arguing that deviations are not permissible if done as part of "state efforts to . . . comply with section 5 of the" VRA).) This does not make sense. Plaintiffs' position seems to be that the Commission was prohibited from deviating ***at all*** from strict population equality if a deviation was intended to ensure compliance with Section 5 of the VRA. This position ignores the governing standard that controls this case: the Constitution does not require mathematically equal legislative districts and minor

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone: 602.798.5400

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone: 602.798.5400

1   deviations are permissible so long as the deviations are not done for an illegitimate

2   arbitrary and discriminatory purpose.  The VRA, and the rights it protects, are among the

3   most important purposes a government can serve.

4           Moreover, the support Plaintiffs cite from the DOJ guidance in no way suggests

5   that Plaintiffs' position is correct.  (*See id.* at 29 (citing 76 Fed. Reg. 7470, 7472 (Feb. 9,

6   2011).)  As Plaintiffs quote, the guidance indeed says that "[p]reventing retrogression . . .

7   does not require jurisdictions to violate the one-person, one-vote principle."    But

8   Plaintiffs elide the very next paragraph, which makes clear that the DOJ would expect the

9   state to make insignificant, minor deviations to prevent retrogression in compliance with

10  Section 5 of the VRA.  *See* 76 Fed. Reg. at 7472 (stating that in considering whether

11  there is a less retrogressive alternative plan for state legislative districts, DOJ would not

12  consider "a plan that would require ***significantly*** greater overall population deviation . . .

13  a reasonable alternative").

14                        (b)     <u>*Strict Scrutiny Does Not Apply to Plaintiffs' Claim.*</u>

15          The fact that compliance with the VRA justifies some of the population deviations

16  at issue does not make those deviations subject to strict scrutiny.  As discussed at length

17  in the Commission's second Motion for Judgment on the Pleadings and the Reply thereto

18  (Docs. 95 and 124), Plaintiffs' claim is not subject to strict scrutiny and their allegations

19  come nowhere close to stating a claim that would be subject to strict scrutiny.  Strict

20  scrutiny applies in districting cases when "race for its own sake, and not other districting

21  principles, was the legislature's dominant and controlling rationale in drawing its

22  districting lines," and when the legislative body "subordinated traditional race-neutral

23  districting principles . . . to racial considerations."  *Bush*, 517 U.S. at 958 (quoting *Miller*,

24  515 U.S. at 916).

25          It is equally clear that "[s]trict scrutiny does not apply merely because redistricting

26  is performed with consciousness of race."  *Id.* (citing *Shaw v. Reno*, 509 U.S. 630, 646

27  (1993)).   "Nor does it apply to all cases of intentional creation of majority-minority

28  districts."  *Id.*  To get to strict scrutiny, the key is that "traditional districting criteria must

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone: 602.798.5400

1    be *subordinated to race*" and if race is "the *predominant* factor motivating the

2    legislature's [redistricting] decision." *Id.* at 959, 962 (citation omitted).  Plaintiffs have

3    alleged no such thing; Plaintiffs allegations repeat that *partisanship* predominated and

4    that other districting principles, including race and other demographics, were

5    subordinated to partisanship. (*See* JPTO at 15.)

6    Plaintiffs' claim that their votes were unconstitutionally diluted ***because of***

7    ***partisanship*** inherently conflicts with a race-based claim that could trigger strict scrutiny.

8    *E.g.*, *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (rejecting strict scrutiny because

9    district could be justified on political grounds); *Hunt v. Cromartie*, 526 U.S. 541, 549-51

10   (1999) (same).  Plaintiffs' allegations are inherently incompatible with a race-based

11   theory that could be subject to strict scrutiny.

12   In addition, Plaintiffs lack standing to assert a claim that any districts were

13   impermissibly underpopulated based on race.  To assert such a claim, Plaintiffs must

14   allege a causally linked constitutional injury.  *Lujan v. Defenders of Wildlife*, 504 U.S.

15   555, 560-61 (1992).  In this context, that means a plaintiff must either live in an

16   underpopulated district or allege evidence to show that they were moved because of race.

17   *See, e.g.*, *Sinkfield v. Kelley*, 531 U.S. 28, 30 (2000); *see also United States v. Hays*, 515

18   U.S. 737, 742-43 (1995).  Race-based claims in districting require "special

19   representational harms" that these Plaintiffs are unable to link to their partisanship claim.

20   *See Hays*, 515 U.S. at 744 (setting forth who would have standing to assert racial

21   gerrymandering claim due to the "special representational harms racial classifications"

22   can cause).

23   (c)    *The Commission Does Not Have a Burden to Show That*
24          *Deviations Were Required to Satisfy the VRA.*

25   Plaintiffs' argument that the Commission has to show that each deviation is

26   necessarily required under the VRA is not only wrong, it also improperly flips the burden

27   of proof.  It is not the Commission's burden to prove that a compelling need justifies each

28   deviation; it is Plaintiffs' burden to overcome the presumption that the Commission acted

constitutionally by showing that the Commission deviated population for illegitimate arbitrary and discriminatory purposes.

The flaw in Plaintiffs' position derives from two errors.  First, Plaintiffs seem to assume that compliance with the VRA necessarily means race was predominant (or else strict scrutiny could not apply).  That is simply wrong: "States may intentionally create majority-minority districts, and may otherwise take race into consideration, without coming under strict scrutiny."  *Bush*, 517 U.S. at 993 (O'Connor, J., concurring).  "[I]n the context of redistricting, where race is considered only in applying traditional redistricting principles along with the requirements of the Voting Rights Act, . . . strict scrutiny is not required."  *DeWitt v. Wilson*, 856 F. Supp. 1409, 1415 (E.D. Cal. 1994) (cited approvingly in *Bush*, 517 U.S. at 958).

Second, Plaintiffs misread cases in which the Supreme Court has held that the VRA does not *mandate* an additional ability-to-elect district as holding that an additional such district is also impermissible.  (*See, e.g.*, Doc. 105 at 8-10.)  But the cases say otherwise.  Indeed, in *Bartlett v. Strickland*, the Supreme Court stated that although it held that Section 2 of the VRA did not *mandate* cross-over districts, it was expressly not considering whether such districts were permissible as a matter of discretion.  556 U.S. 1, 23 (2009).  Section 5 "leaves room" for States to employ them.  *Id.* at 24-25.  Thus, under Section 5, there is no bright line test regarding the minority percentage necessary to qualify as an ability-to-elect district.  *Id.* ("[T]he presence of influence districts is relevant for the § 5 retrogression analysis.").

In *Miller v. Johnson*, a racial gerrymander case, the Supreme Court applied strict scrutiny to a Georgia district because the evidence was "overwhelming, and practically stipulated . . . that race was the predominant, overriding factor in drawing the" district.  515 U.S. at 910 (citation omitted).  In that context, Georgia could not justify its race-predominant districting decisions merely because it mistakenly believed the district was required under Section 5 of the VRA – the state also had to be correct to satisfy strict scrutiny.  *Id*. at 921-26 (explaining Georgia's position that DOJ told state that the district

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone: 602.798.5400

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone: 602.798.5400

1  was required for Section 5 preclearance and holding that VRA did not mandate district).

2  *Miller* therefore presents the precise situation that Plaintiffs have not alleged: that there

3  was overwhelming evidence that race was the predominant factor motiving districting

4  decisions.  If the Court had not concluded that strict scrutiny applied because of the

5  "overwhelming" evidence of race being the predominant factor, the Court never would

6  have scrutinized whether the state got the balance of what the VRA required exactly

7  right.  In other words, the Court's intrusion was justified only because of the "special

8  representational harms racial classifications can cause in the voting context."  *Hays*, 515

9  U.S. at 745.

10  Nothing in *Miller* upsets Justice O'Connor's statements in *Bush* or the Court's

11  discussion in *Bartlett* establishing that states may create nonmandatory ability-to-elect or

12  majority-minority districts without invoking strict scrutiny, so long as race was not the

13  sole or predominant factor motivating the creation of a district.

14  (d)  *The Commission Could Properly Consider Coalition Districts as Part of Its Effort to Ensure Compliance with Section 5 of the VRA.*

16  Finally, the same rationale applies to Plaintiffs' new contention that the creation of

17  coalition districts (LD 24 and LD 26) cannot justify population deviations because the

18  Commission was prohibited from considering new coalition districts in its Section 5

19  retrogression analysis.  (*See* JPTO at 16.)[1]  The argument should be ignored because it

20  was never raised and is irrelevant to Plaintiffs' partisanship claim.  It is also incorrect.

21  Plaintiffs contend that "the IRC could only consider majority-minority districts," not

22  coalition districts, "for purpose of section 5 retrogression analysis."  (*E.g.*, JPTO at 42.)[2]

[1]  A coalition district is one "in which minority citizens are able to form coalitions with voters from other racial and ethnic groups, having no need to be a majority within a single district in order to elect candidates of their choice."  *Georgia v. Ashcroft*, 539 U.S. 461, 481 (2003) (citation omitted).

[2]  Plaintiffs rely in part on the suggestion that the 2006 Amendments to the VRA "rejected" the Supreme Court's approval in *Georgia v. Ashcroft* of use of coalition districts to satisfy Section 5 of the VRA.  (*See* Response to Second Mot. for Judgment on the Pleadings, Doc 105 at 8; *see also* JPTO ¶ 15 (quoting *Texas* footnote discussion of 2006 Amendments impact on Supreme Court's earlier analysis of coalition districts, 831 F. Supp. 2d at 268 n.2).)  Plaintiffs badly misread the 2006 amendments in the same way

(continued...)

12

What relevance this has to whether the Commission acted for an arbitrary, discriminatory reason is unclear, but the case says nothing of the sort.  All that case does is recognize that new coalition districts cannot automatically replace previous ability-to-elect districts; neither that case nor any other purports to hold that the creation or strengthening of a coalition district is irrelevant to Section of the VRA.  *See Texas v. United States* (*Texas I*), 831 F. Supp. 2d 244, 267-68 (D.D.C. 2011) (rejecting Texas's argument that it should not have to consider previous coalition districts in retrogression analysis under Section 5).  If anything, the *Texas* cases underscore that the Commission was wise to try to strengthen coalition districts to the extent possible because of the rigors of Section 5 preclearance.  *See Texas II,* 887 F. Supp. 2d at 177-78 (noting that even though new district appeared to retain same percentage Hispanic population, it had replaced high-turnout voters with low-turnout voters); *Texas I*, 831 F. Supp. 2d at 253, 268 (noting difficulty of establishing that new coalition districts have the ability to elect).

In sum, Plaintiffs are trying to turn this case into a referendum on how the Commission complied with the VRA.  But that is not the claim Plaintiffs alleged: they have alleged that minor population deviations resulted from partisanship.  (Second Am. Compl., Doc. 55 ¶ 2.)  Because the maximum population deviations here are less than 10%, Plaintiffs' claim is subject to a well-established and deferential standard that places the burden on Plaintiffs to overcome a strong presumption of constitutionality.  Compliance with Section 5 of the VRA is unquestionably a legitimate, non-arbitrary purpose for which to make districting decisions.  The mere fact that the VRA is one of the justifications for population deviations does not trigger strict scrutiny.  Under the correct standard, the record comprehensively shows that Plaintiffs cannot meet their burden.

_____
(...continued)
Texas did: "This argument has no support in the text of the Amendments themselves and misreads the legislative history.  Congress only took issue with *Georgia v. Ashcroft* to the extent that it held that states could trade 'influence' districts for prior 'ability' districts without issue under Section 5."  *Texas I*, 831 F. Supp. 2d at 267.  "Congress never found that coalition districts could not provide minority citizens with the ability to elect."  *Id.*

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone: 602.798.5400

**C.      The Other Goals the Commission Followed Are also Rational State Policies.**

The Commission also made population adjustments to further other legitimate policies.  The state policies involved in the population adjustments include, without limitation, respecting communities of interest, using county boundaries, compactness, competitiveness, population balance changes, and technical changes to align with County precinct lines.  *See, e.g.*, *Karcher v. Daggett*, 462 U.S. 725, 740 (1983) (identifying many of these as legitimate polices for population deviations).  These factors are not exclusive.  *Tennant v. Jefferson County Comm'n*, 133 S. Ct. 3, 8 (2012) (per curiam).  Plaintiffs admit that compliance with the Voting Rights Act is one such policy.  (Dkt. 55 ¶ 160.)  All of the other goals listed in the Arizona Constitution also qualify.  *See* Ariz. Const. art. IV, pt. 2, § 1(14).  Moreover, a state may have multiple legitimate objectives, which its plan must balance.  *Tennant*, 133 S. Ct. at 8 (noting that legislature had three objectives); *Perry v. Perez*, 132 S. Ct. 934, 941 (2012) (noting that state entity with responsibility for redistricting must "weigh[] and evaluate[]" criteria and standards "in the exercise of [its] political judgment.").

As discussed further in Plaintiffs' proposed findings of fact, Plaintiffs also intended to serve the legitimate goal to preserve communities of interests.  Community of interest forms an alternative state rationale for creating or enhancing voting rights districts.  *See Vieth*, 541 U.S. at 284 (plurality) (listing "cohesion of natural racial and ethnic neighborhoods" as a separate legitimate criterion from "compliance with requirements of the Voting Rights Act of 1965").[3]

---

[3]  As further detailed elsewhere, including the JPTO (at 10), the parties dispute what law, federal or state, determines "legitimate considerations incident to the effectuation of a rationale state policy."  The Court should determine legitimate state interests as a matter of federal law only.  For instance, consideration of incumbent residency, *see Karcher*, 462 U.S. at 740, may support an Arizona law claim but should not support a federal claim.  *See* Ariz. Const. art. 4, pt. 2, § 15.  Moreover , if the resolution of this federal dispute requires the Court to interpret and determine Arizona state law, then the claim is barred by the Eleventh Amendment, and raises issues as to subject matter jurisdiction under 28 U.S.C. § 1331.

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone: 602.798.5400

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone: 602.798.5400

**D.      Partisanship/Politics Does Not Make Minor Population Deviations Unconstitutional.**

Finally, Plaintiffs' primary assertion that the Commission deviated from population equality for improper partisan reasons fails as a matter of fact and law. Plaintiffs cannot show that the map actually resulted in a partisan effect.  *Cf. Vieth*, 541 U.S. at 315 (Kennedy, J., concurring in judgment) (suggesting that claims for improper partisan districting should have to also show enactment actually "imposes unlawful burdens"); *see also Davis v. Bandemer*, 478 U.S. 109, 127, 139 (1986) (plurality) (requiring showing of "actual discriminatory effect"), *abrogated in Vieth*, 541 U.S. at 305 (plurality concluding that standard in *Bandemer* for identifying unconstitutional partisan gerrymandering is unworkable and dismissing partisanship claim).

The evidence will show that any role politics played in the making of this map was permissible and bears no resemblance to Plaintiffs' allegations that the Commission's goal was to "maximize the number of Democratic districts" (Dkt. 55 ¶ 1).   As Commissioner Stertz testified in his deposition, the Arizona Legislature will remain in the control of the Republican Party for the next ten years.   (Findings of Fact ¶ 117.) Outside of the ten Voting Rights districts, there are only two or three other potential Democratic districts.  The Republicans thus have 17 to 18 safe seats out of 30.  (*Id.*)

Moreover, the Commission maintains the arguments set forth in its Motion to Dismiss (Doc. 40) that an allegation of partisanship is legally insufficient to overcome the presumption that the population deviations were constitutional.   In nearly every redistricting context, courts have either outright held that politics are an expected and legitimate part of the apportionment process, or have been extremely reluctant to intrude on local redistricting legislation.  For instance, in the racial gerrymandering context the Supreme Court held that politics was a legitimate consideration when making districting decisions.  *See Easley*, 532 U.S. at 242 (fact that there was a "legitimate political explanation" for how districts were drawn *defeated* strict scrutiny); *Hunt*, 526 U.S. at 549-51 (reversing summary judgment because there was a genuine issue of material fact

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone: 602.798.5400

1    as to whether the evidence also was consistent with a constitutional political objective,

2    namely, the creation of a safe Democratic seat).

3          Furthermore, in *Vieth* "all but one of the Justices agreed [political bias] is a

4    traditional [redistricting] criterion, and a constitutional one, so long as it does not go too

5    far." *Cox*, 542 U.S. at 952 (Scalia, J., dissenting from summary affirmance).[4]  Even in the

6    stricter Congressional population deviation context, "avoiding contests between

7    incumbent Representatives" has been explicitly approved.  *Karcher*, 462 U.S. at 740; *see*

8    *Vieth*, 541 U.S. at 284 (plurality).  There is no question that consideration of contests

9    between incumbents is a form of "political" consideration.

10         Thus, although the Supreme Court has "not provid[ed] clear guidance" on when

11   politics can justify population deviations, *see LULAC*, 548 U.S. at 423 (opinion of

12   Kennedy, Souter, and Ginsburg), it is evident that the Court has been very hesitant to

13   involve federal courts in essentially local political disputes.[5]

14         It is therefore not surprising that the vast majority of courts considering the

15   constitutionality of minor population deviations have refused to overturn apportionment

16   plans.  *See, e.g.*, *Rodriguez*, 308 F. Supp. 2d at 356 (upholding state senate plan where

17   total population deviation was 9.78%); *Cecere*, 274 F. Supp. 2d at 318 (8.94% maximum

18   deviation in county plan); *Montiel v. Davis*, 215 F. Supp. 2d 1279, 1282-86 (S.D. Ala.

19   2002) (9.93% and 9.78% maximum deviations); *Marylanders for Fair Representation*,

20   849 F. Supp. 1022 (9.84% maximum deviation); *Bonneville County v. Ysursa*, 129 P.3d

21

22

---

23   [4]   Also instructive is the fact that the claim of "political gerrymandering" is on life-
     support after *Vieth*, 541 U.S. at 306.  There, a plurality would have held that such claims
24   are non-justiciable.  Although Justice Kennedy agreed that "great caution is necessary
     when approaching this subject, [he] would not foreclose all possibility of judicial relief."
25   *Id*. at 306 (Kennedy, J. concurring).

26   [5]   Other courts have also found politics to be a legitimate consideration when evaluating
     an equal population challenge.  *Kidd v. Cox*, No. 1:06-cv-997, 2006 WL 1341302, at *11
27   (N.D. Ga. May 16, 2006); *Rodriguez*, 308 F. Supp. 2d at 353; *Cecere v. County of
     Nassau*, 274 F. Supp. 2d 308, 319 (E.D.N.Y. 2003); *Gonzalez v. N.J. Apportionment
28   Comm'n*, 53 A.3d 1230, 1245 (N.J. Super. Ct. App. Div. 2012), *cert. denied*, 59 A.3d 601
     (N.J. 2013).

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone: 602.798.5400

1213, 1217 (Idaho 2005) (9.71% maximum deviation); *State ex rel. Cooper v. Tennant*, 730 S.E.2d 368 (W. Va. 2012) (9.998% maximum deviation).

The sole case that overturned a statewide apportionment notwithstanding a less-than-10% population deviation is *Larios*, 300 F. Supp. 2d 1320. Plaintiffs, as they must, rely principally on this case. But *Larios* is nothing like this case. There, Georgia "pushed the deviation as close to the 10% line as they thought they could get away with, conceding the absence of an 'honest and good faith effort' to construct equal districts." *Id.* at 1352 (citing *Reynolds v. Sims*, 377 U.S. 533, 577 (1964)). That is simply not the case here. As the vast public record already shows and the testimony at trial will support, the Commission's population deviations are justified by traditional, legitimate districting principles.

More importantly, Georgia promoted "a deliberate and systematic policy of favoring rural and inner-city interests at the expense of suburban areas north, east, and west of Atlanta." *Id.* at 1327. Without regard to the partisan motives behind such action, the court held that the apportionment plans "must be struck down on this basis alone, because the Supreme Court has long and repeatedly held that favoring certain geographic regions of a state . . . is unconstitutional." *Id.* at 1342 (citing *Reynolds*, 377 U.S. at 567-68).

Thus, *Larios* involved the sort of evidence that has not even been alleged here. The Georgia legislature intentionally abandoned traditional districting principles and used the 10% window as an exploitable safe harbor within which the state pursued plainly illegitimate policies. *See id.* at 1341-42. Here, in contrast, Plaintiffs rely on a pure partisanship claim manufactured entirely out of indirect, conspiracy-theory-tinged, unreasonable inferences that the Commission's on-the-record intentions must have been a "ruse and artifice." (*See* JPTO at 15.)

*Larios* expressly noted that it did not "decide whether partisan advantage alone would have been enough to justify minor population deviations." *Larios*, 300 F. Supp. 2d at 1351. Plaintiffs' claim stands alone on this theory, lacks evidence, and the Court

should reject it.  For these reasons and those explained above, Plaintiffs' Equal Protection claim fails.

## III.    SUMMARY OF EVIDENCE

The Commission will present evidence establishing that (1) the population deviations are not the result of an improper partisan conspiracy but are the result of the Commission's efforts to balance several competing state policies, including compliance with the Voting Rights Act; (2) the Commission's decisions about the Voting Rights Act were reasonable; and (3) the legislative map favors Republicans, further undermining Plaintiffs' claim based on a partisan bias toward Democrats.

### A.    The Population Deviations in the Final Map Resulted from Adjustments to Strengthen the Voting Rights Act Districts and Other Legitimate Purposes.

Plaintiffs will fail in their effort to establish the population deviations in the map were the product of a partisan effort to maximize Democratic strength at the State legislature.  The evidence in the public record shows that the population deviations were a consequence of the effort to strengthen the ability-to-elect districts and accommodate other legitimate constitutional criteria.  Any resulting overpopulation of Republican plurality districts happened "in spite of" the Commission's goal to equalize population. "Discriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences.  It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."  *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (citation omitted).

There is no evidence that the Commission ever overpopulated a Republican plurality district for a discriminatory purpose.  There were no changes proposed from draft map to final that aimed to increase the population in Republican districts.  To the extent the Republican plurality districts are overpopulated, it was not by design but was the result of legitimate changes to other districts.  And specific efforts were made to reduce those deviations when possible.

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone: 602.798.5400

For example:

- District 2 lost population to an adjacent district because the Commission removed a leg along the border to make Cochise County whole, *see* Findings of Fact ¶92(a);

- District 4 lost population and Republican plurality districts gained population as a result of the Commission's effort to increase Hispanic voting strength in District 4, *see id.* ¶¶ 92(b)(ii), (ix), as explained above, good faith efforts to comply with the Voting Rights Act  may result in population deviations among the districts;

- District 7 lost population to Republican plurality districts as a result of the Commission's effort to accommodate various community-of-interest concerns and maintain a strong district that provided Native American voters the ability to elect candidates of their choice, *see id.* ¶ 92(d);

- District 24 lost small population to Districts 23 and 28 in the Commission's effort to increase the minority voting strength in District 24, *see id.* ¶ 92(f);

- District 26 lost small population to adjacent districts as the Commission worked to increase the minority voting strength in District 26, *see id.* ¶ 92(g); District 26 is still slightly over the ideal district population;

- District 8 lost small population to adjacent districts as the Commission attempted to make it more competitive and increase Hispanic voting strength in the area in light of the area's history as a benchmark district that had elected legislators who were the minority voters' candidates of choice, *see id.* ¶ 92(e);

- Commissioner McNulty proposed a change order that targeted reducing population deviations in several districts, including Republican-plurality districts, *see id.* ¶ 93; and

- The Commission worked to further reduce population deviations in its public meetings without formal change orders, *see id.* ¶ 95.

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone: 602.798.5400

In addition, the demographics show that the overall map was relatively low in population deviation.   The final map's average population deviation is only 2.26%.  (Findings of Fact ¶ 112.)   This is similar to the 1.8% and 1.9% average deviations in *White*, 412 U.S. at 764, and *Gaffney*, 412 U.S. at 737.   Similarly, in *Rodriguez*, where the court granted summary judgment to the state defendants, the average deviations were 2.22% and 2.67%.  308 F. Supp. 2d at 356.[6]  The map's maximum deviation of only 8.8% is also well within the range of states, including those that were required to obtain preclearance.  (Findings of Fact ¶ 113.)

The Commission's contemporaneous record documents the reasons for the proposed changes, and nothing in the record suggests that an improper partisan bias caused the population deviations in the map.

**B.     The Commission's Voting Rights Analysis Provides No Basis for Rebutting the Presumption that the Maps are Constitutional.**

Plaintiffs argue that the Commission's entire approach to complying with the Voting Rights Act was flawed.  There are four problems with their argument.  First, this is not a Voting Rights Act case; it is a partisanship case.  Second, Plaintiffs do not have an expert qualified to testify on the proper functional analysis of the benchmark districts under the Voting Rights Act, so they cannot satisfy any burden of proof regarding Voting Rights Act issues.  Third, as described above, Plaintiffs cannot satisfy their burden that is necessary to rebut the constitutionality of the map's minor population deviations based on their Voting Rights Act theory.  And finally, Plaintiffs do not dispute that compliance with the Voting Rights Act is a legitimate state policy that may justify population deviations.  (Doc. 55 at ¶ 160.)  Nevertheless, this section will briefly respond to some of the specific arguments relating to the Voting Rights Act.

---

[6]   In contrast, the average deviations in *Larios* were much higher – 3.47% and 3.78%.  300 F. Supp. 2d at 1326-27.

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone: 602.798.5400

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone: 602.798.5400

1.      **The Commission's Decision to Establish Ten Voting Rights Districts was Reasonable.**

First, Plaintiffs will likely question whether the Commission correctly concluded that it needed to create ten ability-to-elect districts to receive preclearance.  Most significantly, this was not a partisan issue, and Plaintiffs are challenging partisanship. Tellingly, Plaintiffs' counsel, Mr. Cantelme, wrote the Commission urging it to create nine "Latino-majority" districts if possible (Tr. Ex. 356 at AIRCH0003547-51), which totals ten when considering the Native American district.

In addition, the public record clearly shows that the Commission's decisions were made with information from many sources.  (*Id.* ¶¶ 111-117.)  The Commission's Section 5 expert, Bruce Adelson, believed that the Department of Justice would conclude that there were ten ability-to-elect benchmark districts.  (Findings of Fact ¶¶ 37-39.)  Mr. Adelson urged the Commission to employ the Department of Justice's "functional analysis" of the electoral behavior within the proposed districts as set forth in its preclearance guide at 76 Fed. Reg. 7470, at 7471.  Mr. Adelson also studied the proceedings in *Texas I*, 831 F. Supp. 2d at 262-64, where the district court affirmed the Department of Justice's functional approach when determining whether Texas's legislative map satisfied Section 5.  (Findings of Fact ¶ 39.)  Mr. Adelson advised that it is a common and acceptable practice to underpopulate districts to comply with the Voting Rights Act.  (Findings of Fact ¶ 84.)[7]  The Commission followed this advice and also looked at many other factors when creating Voting Rights Districts.  (*E.g.*, Tr. Ex. 314 at AIRCH000056-133; Tr. Ex. 306 at 220-21.)

On November 29, 2011, after the thirty-day comment period, Harvard University Professor Gary King presented his report (dated November 28) to the Commission,

---

[7] Underpopulating majority-minority districts is common practice because the census undercounts minority communities to a larger extent than other communities. (Expert Report of Bruce E. Cain ("Cain Report") (Ex. 547) ¶ 31; *see also* Arizona Legislature's Memorial Report (Dkt. 56 at 90) (noting that last decade the Commission "underpopulated the legislative majority-minority districts to meet Voting Rights Act benchmarks").)  Indeed, Plaintiffs admit that this is proper.  (*See* Doc. 55 ¶ 160.)

analyzing the effectiveness of the new districts using the ecological inference method. (Findings of Fact ¶ 82-83.)  He followed up before the map was adopted in a subsequent report (*id.* ¶ 102), and his analysis of the final map was presented to the Department of Justice.  (*Id.* ¶ 107.)

As Professor Cain concluded, the Commission acted reasonably in determining that it was necessary to create ten ability-to-elect districts to avoid retrogression.  (*Id.* ¶ 111.)

Second, Plaintiffs will likely question whether Districts 24 and 26 are truly "ability-to-elect" coalition districts.  The record leaves no doubt that the Commission was attempting, in good faith, to make Districts 24 and 26 viable coalition districts that provided minority voters the ability to elect candidates of their choice.  (*Id.* ¶ 92(f), (g).)  The Commission's analysis indicates that both Districts 24 and 26 are viable coalition districts.  (*Id.* ¶ 92(f)(vi); (g)(vii); *see also* Arizona Preclearance Submission at 117-120.)

Finally, Plaintiffs will likely question why the Commission made changes to increase Hispanic voting strength in District 8 since it is not an ability-to-elect district.  Because changes that the Commission was considering to enhance District 8's competitiveness also improved the district's Hispanic voting strength, the Commission's Section 5 expert advised that improving District 8 would greatly strengthen the Commission's preclearance submission.  (Findings of Fact ¶ 92(e).)  The Commission attempted to increase the District's Hispanic strength, but as enacted, the District did not reach ability-to-elect status.  Nothing is wrong with enhancing minority voting strength as the Commission did in District 8, and those changes do not establish a partisan conspiracy related to population deviations.

Thus, none of these voting-rights issues would rebut the constitutionality of the minor population deviations in the Commission's map.  This Commission's legislative map became the first legislative map since Arizona became a covered jurisdiction under Section 5 of the Voting Rights Act in 1975 to achieve preclearance on the first submission.  (Findings of Fact ¶ 107.)

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone: 602.798.5400

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone: 602.798.5400

**2.      Plaintiffs have provided no competent evidence to contradict the Commission.**

Plaintiffs have not pled that the Voting Rights Act is unconstitutional.  Nor do they challenge the functional analysis employed by the Department of Justice.  Rather, Plaintiffs offer an untested numerical-based theory that argues a district can only be considered an ability-to-elect district under Section 5 of the Voting Rights Act if it could independently satisfy the requirements of Section 2 of the Voting Rights Act.  (Findings of Fact ¶¶ 15-16.)  Notwithstanding the fact that this theory rejects the functional analysis employed by the Department of Justice and the courts, there is no basis in law or fact to support Plaintiffs' theory.  Consequently, this Court should decline what amounts to a request by Plaintiffs to create new law that conflicts with the standard adopted by the Department of Justice and other courts.

Plaintiffs' theory is not even supported by their own expert.  Dr. Hofeller admitted in his deposition that to determine the number of ability-to-elect districts in the benchmark map, a functional analysis is required.  When asked about districts that only have an HVAP of 30% (such as Benchmark LD 23), he acknowledged that a functional analysis would be required to determine if these districts have the ability-to-elect.  (Hofeller 2/16/2013 Dep. Tr. at 212:17-213:5.)  He then admitted that he did not use a functional analysis and had no opinion regarding the number of ability-to-elect districts in the benchmark map. (*Id.* at 213:6-214:15.)  Therefore, this Court can conclude as a matter of law that the changes were reasonably necessary under a constitutional reading and application of the VRA because Plaintiffs have not provided any competent evidence that they are not.[8]

---

[8]  Dr. Hofeller's substitute plans ("Plan X") are irrelevant and inappropriate for consideration.  They only purport to create eight ability-to-elect districts, and there is no way of predicting if the Department of Justice would have precleared such a map, given its preclearance of the map with ten ability-to-elect districts.

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone: 602.798.5400

C.     **The Legislative Map Favors Republicans.**

The map itself also undermines allegations of a partisan conspiracy favoring Democrats because there is no question that under the final map, Republicans will continue to control the Arizona Legislature.  (Findings of Fact ¶¶ 114, 117; *see* Second Amended Complaint (Dkt. 55) ¶¶ 110, 113.)

Not only will Republicans control the legislature, they will likely be slightly *overrepresented* relative to their two-way registration with Democrats.    Although Republicans comprise 54.4 percent of registered voters who are either Republicans or Democrats, Republicans are assured of controlling 56.6 percent of the districts (17 of 30), and could potentially control 66.7 percent of the districts in light of the three competitive districts (Districts 8, 9 and 10).   (Findings of Fact ¶¶ 114, 117.)   A map "that more closely reflects the distribution of state party power seems a less likely vehicle for partisan discrimination than one that entrenches an electoral minority."  *LULAC*, 548 U.S. at 419 (opinion of Kennedy, Roberts, and Alito).

In their complaint, Plaintiffs rely only on party registration, not on the range of data the Commission relied on to assess competitiveness, to allege partisan bias.  (*See* Dkt. 55 ¶¶ 109-110, 113.)   But even based on registration alone, their Complaint's allegations support continued Republican control of the Legislature under the Commission's precleared maps.  (*Id.*)

Plaintiffs have deposed all five commissioners, the Commission's consultants, and presumably reviewed the voluminous public record that documents the Commission's mapping decisions at the time the decisions were made.  Yet Plaintiffs have failed to unearth any evidence of an improper partisan motive in the creation of the legislative map, to the extent there is such a claim under federal law.  In the end, Plaintiffs can only point to the pattern that the Republican plurality districts are generally slightly overpopulated and Democratic plurality districts are slightly underpopulated, but that alone is not evidence of partisan bias.  And, as described above, there is also no evidence of partisan effect in the overall map.

## CONCLUSION

The record shows that the Commission made good faith changes to the map in order to receive preclearance under Section 5 of the Voting Rights Act and to accommodate other constitutional criteria.  Plaintiffs cannot meet their burden of proof necessary to rebut the constitutionality the legislative map based on its minor population deviations.

RESPECTFULLY SUBMITTED this 18th day of March, 2013.

BALLARD SPAHR LLP                        OSBORN MALEDON, P.A.

By:/s/ Joseph A. Kanefield              By:/s/ Colin F. Campbell (*with permission*)
Joseph A. Kanefield (015838)            Colin F. Campbell (004955)
Brunn W. Roysden III (028698)           Mary R. O'Grady (011434)
Colleen M. Reider (027260)              Jeffrey B. Molinar (018512)
                                        Joseph N. Roth (025725)

*Attorneys for the Arizona Independent Redistricting Commission*

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone: 602.798.5400

**CERTIFICATE OF SERVICE**

I hereby certify that on March 18, 2013, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants on record.

/s/Brunn W. Roysden III

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone: 602.798.5400