**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Wesley W. Harris, et al., | No. CV-12-00894-PHX-ROS-NVW-RRC |
|                Plaintiffs, | |
| v. | |
| Arizona Independent Redistricting Commission, et al., | |
|                Defendants. | |

NEIL V. WAKE, District Judge, concurring in part, dissenting in part, and dissenting from the judgment:

In this action voters challenge the final map of Arizona legislative districts approved by the Independent Redistricting Commission on January 17, 2012. They allege that the districts violate the one person, one vote requirement of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by systematically overpopulating Republican plurality districts and underpopulating Democratic plurality districts with no lawful justification for deviating from numerical equality. Arizona's final legislative district map violates the Equal Protection Clause unless the divergence from equal population is "based on legitimate considerations incident to the effectuation of a rational state policy," *Reynolds v. Sims*, 377 U.S. 533, 579 (1964), "that are free from any taint of arbitrariness or discrimination." *Roman v. Sincock*, 377 U.S. 695, 710 (1964).

Partisan advantage is not itself a justification for systematic population inequality in districting. No authority says it is, and neither does the Commission or any judge of this Court. So the Commission must point to something else to justify its deviation. Without something else, there is nothing to weigh against the force of equality, and this inequality must fall under constitutional doctrine settled for half a century.

The Commission contends the systematic population deviation for Democratic Party benefit was permissible to increase the likelihood of obtaining preclearance required by Section 5 of the Voting Rights Act. So this case turns on whether systematic population inequality is a lawful and reasonable means of pursuing preclearance.

But after the trial, the United States Supreme Court held Section 5 preclearance unenforceable, extinguishing that sole basis for this deviation. We must apply current law in pending cases, especially cases to authorize future conduct. So even if Section 5 saved the inequality when adopted, it cannot save the inequality for future elections. The Court exceeds its power in reanimating Section 5 to deny the Plaintiffs equal voting rights for the remaining election cycles of this decade.

If we do look back at Section 5, it never had the force the Commission hopes. The Court further errs when it holds, for the first time anywhere, that systematic population inequality is a reasonable means of pursuing Voting Rights Act preclearance. That is contrary to the text, purpose, case law, and constitutional basis for Section 5 preclearance. Until struck down, Voting Rights Act preclearance was a legitimate and mandatory purpose in redistricting for covered jurisdictions. But its legitimacy in general has no connection to the principled bases for compromising population equality. Compliance with the Voting Rights Act requires line-drawing with an eye to expected voting behavior, but only within equal population. Section 5 does not require or permit systematic inequality of population that would otherwise violate the Equal Protection Clause. It does not authorize the federal executive branch to exact such inequality for preclearance, a power the Attorney General disclaims. Nor does it license redistricting authorities to volunteer inequality to the Attorney General for which he never asks. The

1   Commission's reliance on the Voting Rights Act for systematic malapportionment is
2   precluded by the plain language of Section 17 that nothing in the Act "shall be construed
3   to deny, impair, or otherwise adversely affect the right to vote of any person."  42 U.S.C.
4   § 1973n.

5       Judge Clifton correctly finds that the Commission was actually motivated by both
6   party advantage and hope for Voting Rights Act preclearance.  So we have a majority for
7   that finding of fact.  And while that fact is obvious on this record, the finding of partisan
8   motive is not needed to make the case.  No precedent would require proof and a finding
9   of subjective purpose of party advantage when it is already proven that the systematic
10  numerical inequality has no justification that is legal and reasonable.  It is enough to
11  strike down this systematic overpopulation of Republican plurality districts and
12  underpopulation of Democratic plurality districts that neither the Commission's stated
13  reason to get preclearance nor its other actual motive of party advantage is a valid reason
14  for population inequality.  So even if one could believe that the aggressive party
15  advantage was just a side effect and no part of the wellsprings of conduct, the
16  Commission's only offered justification still falls.  With no valid counterweight, the
17  population-skewed map falls to the force of equal voting rights under the Constitution.

18      When voting districts were set without standards and behind closed doors, true
19  reasons for systematic population deviation were easily disguised.  But in states that have
20  made the redistricting process transparent and accountable with limited grounds to
21  deviate, it is now sometimes possible to prove that systematic population inequality for
22  party advantage has no other reason, or none that passes under equal protection doctrine.

23      No better example could be found than this.  Of 30 legislative districts, the 18 with
24  population deviation greater than ±2% from ideal population correlate perfectly with
25  Democratic Party advantage.  The Commission majority showed other partisan bias, but
26  even without that, the statistics of their plan are conclusive.  Because this population
27  deviation range of 8.8% is under 10%, the Plaintiffs have the burden of showing it is not
28  "incident to effectuation of a rational state policy."   The Commission offers no

justification except Voting Rights Act preclearance, which is insufficient as a matter of law.  The Commission knew the legal risk they were taking in grounding systematic numerical inequality on the Voting Rights Act.  The circumstance that the Commission took that risk with advice of counsel does not make losing the gamble as good as winning, not when they are gambling with other people's rights.  The Plaintiffs have carried their burden.  This numerical dilution or inflation of all the votes in 60% of Arizona's legislative districts for nearly two million voters cannot be squared with our fundamental law of equal voting rights.

The Commission has been coin-clipping the currency of our democracy—everyone's equal vote—and giving all the shavings to one party, for no valid reason.  The novel and extraordinary claim of Voting Rights Act license to dilute votes systematically and statewide should be rejected.  That should decide this case and end our inquiry.  This plan must be sent back and done again.

**I.    THE ARIZONA REDISTRICTING PROCESS**

By an initiative measure in 2000, Arizona voters removed legislative and congressional redistricting from the legislature and entrusted them to an Independent Redistricting Commission under mandatory processes with substantive standards.  *See* Ariz. Const. art. IV, pt. 2, § 1.  Four party commissioners are appointed, one each by the highest-ranking majority and minority members of the Senate and the House of Representatives.  They choose an independent fifth member.  All appointments are from 25 nominations made by another commission.

The constitutional amendment requires the Commission to follow a four-step process.  *Ariz. Minority Coal. for Fair Redistricting v. Ariz. Indep. Redistricting Comm'n*, 220 Ariz. 587, 597, 208 P.3d 676, 686 (2009).  First, the Commission must create "districts of equal population in a grid-like pattern across the state."  Ariz. Const. art. IV, pt. 2, § 1(14).  Second, the Commission must adjust the equally populated grid map "as necessary to accommodate" compliance with the United States Constitution and the United States Voting Rights Act and then to accommodate the remaining five goals "to

the extent practicable":  (1) equal population; (2) geographically compact and contiguous districts; (3) respect for communities of interest; (4) use of visible geographic features, city, town, and county boundaries, and undivided census tracts; and (5) competitive districts, where such districts would create no significant detriment to the other factors. *Id.* § 1(14)(A)–(F).  Third, the Commission must advertise their adjusted draft map for at least 30 days and consider public comments and recommendations made by the Arizona legislature.  *Id.* § 1(16).  Lastly, the Commission must establish final district boundaries and certify the new districts to the Arizona Secretary of State.  *Id.* § 1(16)–(17).

Other states have also "adopted standards for redistricting, and measures designed to insulate the process from politics."  *Vieth v. Jubelirer*, 541 U.S. 267, 277 n.4 (2004) (identifying Hawaii, Idaho, Iowa, Maine, Montana, New Jersey, and Washington).  In 2009, 13 states gave a redistricting commission primary responsibility for drawing the plan for legislative districts, five states required a backup commission to draw the plan if the legislature failed to do so, two states had an advisory commission, and Iowa required nonpartisan legislative staff to develop maps without any political data to be voted upon by the legislature.  National Conference of State Legislatures, *Redistricting Commissions*, http://www.ncsl.org/research/redistricting/2009-redistricting-commissions-table.aspx   (last visited April 23, 2014).

In Arizona, the Commission is required to comply with the state public meetings law and constitutional procedural and substantive requirements.  Transcripts of their meetings are available to the public.  The Commission's weighing of considerations, including the advice they received from counsel and consultants, is laid bare for public and judicial scrutiny.  The voters "imposed a specific process that the Commission must follow," and judicial review "must include an inquiry into whether the Commission followed the mandated procedure."  *Ariz. Minority Coal. for Fair Redistricting*, 220 Ariz. at 596, 208 P.3d at 685.  Limited substantive judicial review addresses only whether "the record demonstrates that the Commission took [the] goal[s] into account during its

1   deliberative process" and whether "the plan lacks a reasonable basis."  *Id.* at 597–98, 600,

2   208 P.3d at 686–87, 689.

3          On January 17, 2012, the Commission approved the 2012 final legislative map by

4   a vote of three to two, the independent chair and the two Democratic Party appointees

5   against the two Republican Party appointees.  In the prior decade the first redistricting

6   commission drew no district with a population deviation greater than ±2.42%, not for any

7   reason, including Voting Rights Act preclearance, which was eventually received.  In

8   contrast, the 2012 map establishes 30 legislative districts with a maximum population

9   deviation of 8.8%.  Nine districts have populations that exceed the ideal population by

10  more than 2%.  All of those districts have more registered Republicans than registered

11  Democrats.  Nine other districts are underpopulated by more than 2%.  All of those

12  districts have more registered Democrats than registered Republicans.  Therefore, of the

13  18 districts that deviate more than ±2% from ideal population, all are underpopulated

14  Democratic-leaning districts or overpopulated Republican-leaning districts.  Here is the

15  array of districts from most underpopulated to most overpopulated, showing predominant

16  party registration:



17–28  (Trial Ex. 40.)

Districts 7, 4, 27, 3, 2, 24, 19, 30, and 8 are all underpopulated by more than 2% and contain more registered Democrats than Republicans (Democratic registration plurality). Districts 14, 20, 18, 28, 5, 16, 25, 17, and 12 are all overpopulated by more than 2% and contain more registered Republicans than Democrats (Republican registration plurality). The following table isolates the 18 districts with population deviations exceeding 2%.

| | District | Population | Deviation from Ideal Population | |
|---|---|---|---|---|
| | | | # | % |
| Democratic registration plurality | 7 | 203,026 | -10,041 | -4.7 |
| | 4 | 204,143 | -8924 | -4.2 |
| | 27 | 204,195 | -8872 | -4.2 |
| | 3 | 204,613 | -8454 | -4.0 |
| | 2 | 204,615 | -8452 | -4.0 |
| | 24 | 206,659 | -6408 | -3.0 |
| | 19 | 207,088 | -5979 | -2.8 |
| | 30 | 207,763 | -5304 | -2.5 |
| | 8 | 208,422 | -4645 | -2.2 |
| Republican registration plurality | 14 | 217,693 | +4625 | +2.2 |
| | 20 | 218,167 | +5099 | +2.4 |
| | 18 | 218,677 | +5609 | +2.6 |
| | 28 | 218,713 | +5645 | +2.6 |
| | 5 | 219,040 | +5972 | +2.8 |
| | 16 | 220,157 | +7089 | +3.3 |
| | 25 | 220,795 | +7727 | +3.6 |
| | 17 | 221,174 | +8106 | +3.8 |
| | 12 | 221,735 | +8667 | +4.1 |

(Doc. 35-1 at 101.)

## II. PARTISAN ADVANTAGE ALONE DOES NOT JUSTIFY SYSTEMATIC UNEQUAL POPULATION

### A. Unequal Population Under the Equal Protection Clause

The Equal Protection Clause of the Fourteenth Amendment "guarantees the opportunity for equal participation by all voters in the election of state legislators." *Reynolds v. Sims*, 377 U.S. 533, 566 (1964). The right to vote is personal, and impairment of the constitutional right to vote touches a sensitive and important area of human rights:

> Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society. Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.

*Id.* at 561–62. "Overweighting and overvaluation of the votes of those living here has the certain effect of dilution and undervaluation of the votes of those living there." *Id.* at 563. "Diluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discriminations based upon factors such as race or economic status." *Id.* at 566 (citations omitted). A person's place of residence "is not a legitimate reason for overweighting or diluting the efficacy of his vote." *Id.* at 567.

Each state is required to "make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." *Id.* at 577. Although "it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens, or voters," divergences from a strict population standard must be "based on legitimate considerations incident to the effectuation of a rational state policy." *Id.* at 577, 579. To satisfy the Equal Protection Clause, legislative apportionment must result from "faithful adherence to a plan of population-based representation, with such minor deviations only as may occur in recognizing certain factors that are free from any taint of arbitrariness or discrimination." *Roman v. Sincock*, 377 U.S. 695, 710 (1964). Deviation even for a permitted purpose is discriminatory and unconstitutional if applied only where it benefits one party. *Larios v.*

*Cox*, 305 F. Supp. 2d 1335, 1339 (N.D. Ga. 2004) (three-judge court) (deviation to protect incumbents, but only Democrats), *aff'd*, 542 U.S. 947 (2004).

Because some legitimate districting goals compete with numerical equality, states may weigh them against each other up to a point.  There is a burden-shifting framework for population deviation claims.  Generally, a legislative apportionment plan with a maximum population deviation greater than 10% creates a prima facie case of discrimination and therefore must be justified by the state.[1]  *Brown v. Thomson*, 462 U.S. 835, 842–43 (1983).  The plan may include "minor deviations," which is a technical term meaning less than 10%, free from arbitrariness or discrimination.  But there is no safe harbor for population deviations of less than 10%.  There is a rebuttable presumption that a population deviation less than 10% is the result of an "honest and good faith effort to construct districts . . . as nearly of equal population as is practicable."  *Daly v. Hunt,* 93 F.3d 1212, 1220 (4th Cir. 1996) (quoting *Reynolds*, 377 U.S. at 577).  The burden shifts to the plaintiff to prove that the apportionment was "an arbitrary or discriminatory policy." *Larios*, 305 F. Supp. at 1338–39 (citing *Roman*, 377 U.S. at 710); *Daly*, 93 F.3d at 1220.

In sum, arbitrariness and discrimination disqualify even "minor" population inequality within 10%.  The flexibility accorded to states for those minor deviations, without the initial burden of justifying them, accommodates legitimate interests that are reasonably served by some population inequality.  But it is tautologically true that legitimate state goals that harmonize with population equality can carry no weight against the constitutional value of equality.  Those goals legitimately may be pursued, but not by population inequality.

---

[1]  In contrast, congressional districts must be drawn with equal population "as nearly as is practicable."  *Tennant v. Jefferson Cnty. Comm'n*, __ U.S. __, 133 S. Ct. 3, 5 (2012) (total population variance of 0.79% was justified by the state's legitimate objectives).  "[T]he 'as nearly as is practicable' standard does not require that congressional districts be drawn with 'precise mathematical equality,' but instead that the State justify population differences between districts that could have been avoided by 'a good-faith effort to achieve absolute equality.'"  *Id.* (quoting *Karcher v. Daggett*, 462 U.S. 725, 730 (1983)).

**B.   Partisan Advantage**

The Supreme Court has not decided whether partisan advantage itself is a permissible reason for population inequality, that is, whether it carries any weight or no weight against equality in the analysis.[2]   *See, e.g., Cox v. Larios*, 542 U.S. 947, 951 (2004) (Scalia, J., dissenting from summary affirmance) ("No party here contends that . . . this Court has addressed the question" of whether a redistricting plan with less than 10% population deviation may be invalidated on the basis of evidence of partisan political motivation.); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 423 (2006) ("Even in addressing political motivation as a justification for an equal-population violation . . . *Larios* does not give clear guidance.").

The Supreme Court precedents discussed above readily yield the conclusion that partisan advantage is not itself a legitimate, reasonable, and non-discriminatory purpose for systematic population deviation.   Again, the Commission does not argue that it is. General principles of voting rights capture the issue, and there is no contrary gravitational pull from any competing constitutional principle.   Party discrimination in population punishes or favors people on account of their political views.   It is discriminatory and invidious.   It serves an unfair purpose at the price of a constitutional right that all voters have, regardless of how they plan to vote.

Bare party advantage in systematic population deviation carries no weight against the baseline constitutional imperative of equality of population.   Under settled constitutional analysis, unless the Commission has some other legitimate, actual, and honest reason for the inequality, the force of equality must win out.

Federal law would have this force even if state law purported to legitimate population deviation for partisan advantage.   Imagine a state statute that required Democratic-leaning districts to be overpopulated up to +5% and Republican-leaning districts to be underpopulated down to -5%.   Such a statute would add no weight to the

---

[2] Nor has the Supreme Court addressed whether party advantage carries any weight against equality in the federal constitutional calculus if state law itself bars it, as Arizona does.

weightless purpose of party advantage and could not change the federal equal protection balance from what it would be without the statute.  Arizona law makes our task even easier by excluding partisan advantage as a purpose for unequal population or anything else in redistricting.  The Arizona Constitution twice mandates equal population, subject only to adjustments for four other permitted goals and compliance with federal law.  Ariz. Const. art. IV, pt. 2, § 1(14).   None of those permitted goals encompasses partisan political advantage.

### C. Systematic Inequality of Population for Partisan Advantage Is Sometimes Provable and Is Subject to Judicially Manageable Standards

Systematic inequality of population for partisan advantage is sometimes provable from the statistics alone and exclusion of other justifications.  Where that demanding test is met, as it is here, the equal protection violation is proven and remediable.

Before the reform of redistricting procedures and substantive standards in Arizona and other states, it was usually possible to mask actual partisan purposes by overlaying some other arguable reason for the population deviation.   In the absence of state-mandated standards and transparent processes, any standard permissible under federal law could be invoked after the fact and without regard to true motives.  No doubt that will remain the case for specific instances of partisan population inequality.  But Arizona now prohibits the secrecy of process and the indeterminacy of standards that previously put even systematic partisan deviation beyond judicial remedy because of the inability to exclude other explanations.  In the states with redistricting reform, it can sometimes be proven that partisan advantage was a real and substantial cause of the deviation, with no additional reason, or none that is valid.

To be sure, when political actors are charged with applying even neutral criteria of districting, they will know and enjoy the political benefits of using that wide discretion one way and not another.  Political motivations will remain, resulting in population inequality here and there in innumerable line-drawing choices that are overlain with defensible neutral purposes even though they may not be the real purposes.  Limitations

1    of judicial competence weigh against inquiry as extensive as that of the redistricting

2    authority itself to find and remedy specific abuses of equality.

3         But this case is not about a district here or there that is out of balance for partisan

4    benefit.   This is about systematic population inequality for party advantage that is not

5    only provable but entirely obvious as a matter of statistics alone.   A bright line

6    requirement of statistical proof, not just anecdotal evidence, is well within judicial

7    competence.   By the expert evidence here, the neutral principles of districting are

8    politically random, and it is statistically impossible for them to yield this perfect

9    correlation of population inequality with one party advantage in 18 of 18 districts.  But it

10   does not take a Ph.D. to see this stark fact of intended party benefit.   It would be

11   reversible error to find the facts otherwise, even if the Commission did not admit it was

12   consciously drawing party advantage.   As thus narrowly defined, the test for proof of

13   intended systematic party advantage—statistical proof and exclusion of other justifying

14   reasons—will exclude all but the obvious cases, easily proven, as this one is.  The low-

15   hanging fruit is within the reach of the Equal Protection Clause even if the rest is not.

16   Constitutional doctrine must mark out systematic population inequality, proven by

17   statistics, as unreasonable, discriminatory, and actionable, provided no other legal reason

18   saves it.

19        Limitations of judicial competence that weigh against remedy of partisan

20   gerrymandering even within equal population are no barrier to proof or remedy for

21   systematic inequality of population for partisan advantage.   Line-drawing within equal

22   population can be done with an eye to expected voting behavior to serve some legitimate

23   purposes.   Line-drawing within equal population for unworthy purposes, like party

24   advantage, escapes judicial remedy for lack of judicially manageable standards.  *Vieth v.*

25   *Jubelirer*, 541 U.S. 267, 281, 305 (2004).   But the narrow and bright line test stated

26   above for proving discrimination in numerical inequality has no such infirmity.   The

27   sound reasons for judicial hesitation to remedy partisan gerrymandering within equal

28

1     population do not fit the different wrong of systematic population inequality for partisan

2     advantage with no other justification.

3           The systematic inequality for partisan purposes does not end the case if the

4     inequality has other justification.  Those unworthy partisan motives should not trump

5     parallel valid motives.  The equal protection analysis requires further inquiry whether

6     those other justifications are legally sufficient and actual, honest motives.  The Arizona

7     Constitution's exclusion of all but a few permitted reasons to deviate from equal

8     population leaves the Commission with only Section 5 preclearance to explain its

9     pervasive party preference.

10          The Commission has not made and cannot make any general invocation of

11    theoretically valid reasons for the unequal population.  There is only the Voting Rights

12    Act, on which the case now hangs.

## III. PRECLEARANCE UNDER THE VOTING RIGHTS ACT DOES NOT REQUIRE OR PERMIT SYSTEMATIC POPULATION INEQUALITY

### A. The Voting Rights Act and Section 5 Preclearance

The Voting Rights Act, enacted in 1965 to enforce the Fifteenth Amendment, "employed extraordinary measures to address an extraordinary problem."  *Shelby Cnty. v. Holder*, __ U.S. __, 133 S. Ct. 2612, 2618 (2013).  Section 4 suspended literacy, education, character, and reference qualifications to vote in certain jurisdictions as defined in that section.  42 U.S.C. § 1973b.  Under Section 5, no change in voting standard, practice, or procedure could take effect in those jurisdictions without obtaining administrative "preclearance" through the Attorney General or a declaratory judgment from the United States District Court for the District of Columbia that the voting change comports with Section 5.  *Shelby Cnty.*, 133 S. Ct. at 2620.

> Section 5 of the Act required States to obtain federal permission before enacting any law related to voting—a drastic departure from basic principles of federalism.  And § 4 of the Act applied that requirement only to some States—an equally dramatic departure from the principle that all States enjoy equal sovereignty.  This was strong medicine, but Congress determined it was needed to address entrenched racism in voting, "an insidious and pervasive evil which had been perpetuated in certain parts of

our country through unremitting and ingenious defiance of the Constitution." *South Carolina v. Katzenbach*, 383 U.S. 301, 309 (1966). As we explained in upholding the law, "exceptional conditions can justify legislative measures not otherwise appropriate." *Id.* at 334. Reflecting the unprecedented nature of these measures, they were scheduled to expire after five years.

*Id.* at 2618.

This "extraordinary measure" and "strong medicine" was an appropriate remedy for the century of racially discriminatory voting practices and procedures in the six states originally targeted for preclearance. Successful but time-consuming and costly litigation against state and local practices was routinely evaded by bad faith enactment of new discriminatory laws. The repetitive new laws blunted the Constitution's stated measure for protecting federal rights—the Supremacy Clause and case-by-case adjudication. That history justified freezing voting practices in those jurisdictions, absent advance determination that the changes do not have the purpose or effect of denying or abridging the right to vote on account of race or color. *Id.* at 2618–19, 2624.

The 1975 amendment created new rights for four language minority groups in certain jurisdictions and extended Section 5 preclearance to those jurisdictions, including Arizona. The 1975 amendment also added the Fourteenth Amendment as a basis for the Act.

Any voting change that had the purpose or effect of diminishing the ability of any citizens of the United States "on account of race or color or in contravention of the [language] guarantees" to elect their preferred candidates of choice, *i.e.*, "retrogression," would not receive preclearance. *See* 42 U.S.C. § 1973c(b). Retrogression requires a comparison of a jurisdiction's new voting plan with its existing plan; the existing plan is the benchmark against which the effect of voting changes is measured. *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 478 (1997).

Notwithstanding "the unprecedented nature of these measures," originally intended for only five years, they were extended repeatedly. *Shelby Cnty.*, 133 S. Ct. at 2618. On June 25, 2013, after the trial in this case, the Supreme Court held Section 5's coverage formulas in Section 4(b) no longer constitutional because they had lost rational

- 14 -

1   connection to the circumstances and criteria originally justifying that extraordinary
2   remedy.  *Id.* at 2631.  But Congress may restore Section 5 by giving Section 4(b) a
3   reasonable application.

4      **B.   This Case Must Be Decided in Accordance With Current Law, Under
           Which Section 5 Is Now Unenforceable**

5          Pending civil cases must be decided in accordance with current law.   The
6   Commission relied on maximizing Voting Rights Act Section 5 preclearance as a
7   legitimate state interest to justify systematic partisan population deviation.  Because of
8   *Shelby County*, Section 5 preclearance now cannot be applied in any jurisdiction because
9   the formulas in Section 4 are unconstitutional.   Thus, even if Section 5 could justify
10  population inequality before *Shelby County*, it cannot now.  To allow the current map to
11  govern successive election cycles until 2020 would give continuing force to Section 5
12  despite the unconstitutionality of applying it anywhere.

13         "When [the Supreme Court] applies a rule of federal law to the parties before it,
14  that rule is the controlling interpretation of federal law and must be given full retroactive
15  effect in all cases still open on direct review and as to all events, regardless of whether
16  such events predate or postdate our announcement of the rule."  *Harper v. Virginia Dep't
17  of Taxation*, 509 U.S. 86, 97 (1993).   The circumstance that Arizona could and did
18  comply with the law at the time—seeking and getting preclearance—does not release it
19  from the rule of law that governs everyone else for future events.  If it did, retroactivity
20  would rarely apply.

21         In some circumstances, however, "a well-established general legal rule that trumps
22  the new rule of law, which general rule reflects *both* reliance interests and other
23  significant policy justifications," may prevent the new rule from applying retroactively.
24  *Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 759 (1995).   Reliance alone—even
25  reasonable reliance—is generally insufficient to avoid retroactivity.  *Id.* at 758–59.  For
26  example, qualified immunity sometimes shields state officers from personal liability
27  under 42 U.S.C. § 1983 and other statutes based on the state of the law at the time of the
28  conduct, even if the law has changed by the time of the adjudication.  This exception to

retroactivity is animated by "special federal policy concerns related to the imposition of damages liability upon persons holding public office." *Id.* at 758. Those policy concerns are not present here, where the Plaintiffs seek prevention of future government injuries rather than personal money damages for past harm. Qualified immunity has nothing to do with injunction against violating federal rights in the future, even newly announced rights that could not have been anticipated.

There are no "significant policy justifications" or "special circumstance[s]," *id.* at 759, or other reasons to think "the importance of the reliance interests that are disturbed" makes this an "exceptional case[]," *id.* at 761 (Kennedy, J., concurring), dispensing with the general rule of retroactivity. The party urging an exception to retroactivity bears the burden, and here the case for retroactivity is easy. Applying *Shelby County* to this case cannot change the outcomes of elections conducted under the current map. Instead, the only things at stake are future elections. After *Shelby County*, Section 5 has ceased to be a valid justification for unequal population, even if, by hypothesis, it was a valid justification before. The Commission's "reliance" interest here is only the trivial one of not wanting to spend a few weeks finishing the job for which they volunteered. They can shave their boundaries into equality for nothing compared to the years and millions they are spending to resist doing so. If *Shelby County* is not applied, then Section 5 will continue to dilute votes in Arizona for the next four election cycles of this decade, in disregard of the law that binds us and the rights of hundreds of thousands of voters. For this reason alone, the Commission must revise the current map.

The Court would avoid these clear principles by splitting fine hairs between being constitutional, but nowhere, and being unconstitutional anywhere. The Court bases the difference on invalidation of Section 4(b) coverage formulas in general rather than invalidation of Section 5 as a substantive remedy for any particular jurisdiction. It has long been settled that the extraordinary remedy of preclearance is not intrinsically unconstitutional if extraordinary circumstances justify it. *South Carolina v. Katzenbach*, 383 U.S. 301, 334–35 (1966). Because *Shelby County* made Section 5 inapplicable

- 16 -

1   everywhere by invalidating the coverage formulas in general, the Supreme Court did not

2   reach as-applied challenges to Section 5 for specific jurisdictions, including Arizona.

3       It does not distinguish the retroactivity doctrine to say that "the preclearance

4   process" was not invalidated though the coercion to do it was.   Slip Op. at 47.

5   Retroactivity does not make it misconduct for a jurisdiction to have complied with

6   Section 5, it just prevents that past conduct from reverberating into the future to the

7   detriment of other people's rights as we now know them to be.

8       Retroactively stripping the Voting Rights Act cover from the Commission's

9   systematic partisan malapportionment, assuming it was cover before, would not mean all

10   the 2010 maps done in covered jurisdictions "are now invalid."   Slip Op. at 48–49.

11   Hopefully few or no other jurisdictions conscripted Section 5 preclearance to work

12   statewide partisan malapportionment.   But if any others did, their maps most assuredly

13   "are now invalid" and need to be remedied.   That does not cut against the general

14   principle of retroactivity; it is the very reason for it.

15      **C.**    **Voting Rights Act Preclearance Does Not and Could Not Authorize**

16           **Systematic Population Inequality**

17       If we had power to give continuing effect to Section 5 in deciding this case, on the

18   merits it is further error to give it effect that changes the outcome of this case.

19   Complying with Section 5 and obtaining preclearance under the Voting Rights Act was a

20   legitimate objective in redistricting; indeed, at the time it was mandatory.   But the

21   legitimacy of the goal in general has no relation in logic or principle to the validity of

22   using population inequality to get there.   A state must "show with some specificity that a

23   particular objective required the specific deviations in its plan, rather than simply relying

24   on general assertions."   *Karcher v. Daggett*, 462 U.S. 725, 741 (1983) (congressional

25   districting).   The reasoning from general validity of complying with the Voting Rights

26   Act to using systematic population inequality to do so is entirely circular.   All Section 5

27   compliance must be by means that are legal under federal law, and there is nothing but

28   assertion behind the conclusion that the one person, one vote principle is excepted from

that.

The Supreme Court has not directly addressed whether systematic population inequality is a legal means of pursuing preclearance.  But there is no basis in statutory text, administrative interpretation, or precedent to conclude that Congress purported to authorize state redistricting authorities or the federal executive branch to systematically dilute people's equal voting rights for any reason, least of all as a protection of equal voting rights.

1.     At the highest level of generality and within limits, the Constitution "defers to state legislative policies, so long as they are consistent with constitutional norms":

> Any number of consistently applied legislative polices might justify some variance, including, for instance, making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent[s] . . . .   As long as the criteria are nondiscriminatory . . . these are all legitimate objectives that on a proper showing could justify minor population deviations.

*Id.* at 740 (congressional districting).  This deference respects the state's autonomy of policies where they require accommodation from numerical equality, provided the other conditions are met of nondiscrimination, consistent application, and consistency with constitutional norms.

But there is no *state* policy in this case, except ironically the equal population policy that prohibits what the Commission has done unless federal law mandates it.  There is only the state's duty to federal law under the Supremacy Clause.  The Arizona Constitution restates what it need not have said, that Arizona districting must comply with federal law, including the Voting Rights Act.  Arizona has made a firm policy choice that does merit federal deference, but it is the choice to forbid inequality except for four reasons not relevant in this case.  If Arizona's restatement of its duty to federal law can be called a state policy, it is a state policy that takes its entire content from the substance of the federal law and policy to which it yields.  It has no independence from federal policy that could change federal policy to accommodate it.

So we must look to federal law to find what obtaining preclearance requires, permits, and does not permit.  The critical question then is whether Congress did and

could authorize systematic population inequality to comply with Section 5 preclearance. This case does not turn on whether the Commission had a bad motive of partisan preferment, though it did, or on which motive predominated, though the preclearance motive fell short of covering all the depopulation here. It turns on whether the valid motive of preclearance changes the equal protection calculus for using the means of systematic population inequality to get there. There is no independent state policy of preclearance malapportionment to defer to.

The Commission and the Court would start and end with the fact that wanting to get Section 5 preclearance is valid. But again, there must be "some specificity that a particular objective required the specific deviations in its plan, rather than simply relying on general assertions." *Id.* at 741. They would have federal policy deferring to state policy, state policy deferring to federal policy, and the buck stopping nowhere. We proceed to address whether Section 5 preclearance authorizes systematic population inequality.

2. Nothing in the text of the Voting Rights Act purports to require or authorize population inequality in legislative districting, directly or by implication. *See* 42 U.S.C. § 1973c(a). Section 17 of the Voting Rights Act forbids it in sweeping terms:

> Nothing in subchapters I-A to I-C of this chapter shall be construed to deny, impair, or otherwise adversely affect the right to vote of any person registered to vote under the law of any State or political subdivision.

42 U.S.C. § 1973n. Distorting the weight of all the votes in 60% of the legislative districts in Arizona would plainly "impair, or otherwise adversely affect" half of the voters in those districts. It is hard to think of more comprehensive language to exclude systematic vote dilution as a required or permitted means to comply with the Voting Rights Act. The Act must be honored, but with the other available tools that do not steal from some voters to give to others.

3. There is conclusive proof that Section 5 non-retrogression and preclearance yield to population equality. We have in real life what would be a perfect experiment if designed for a laboratory. In covered states, preclearance is also required for

congressional redistricting and is given despite near perfect equality of population in every instance.   The Department of Justice knows how to accommodate non-retrogression goals for protected minorities with population equality.

4.   The blunt fact is that the Department of Justice has never required unequal population for preclearance in the 48 years of administering Section 5.   Although the Attorney General must state the reasons for interposing an objection, 28 C.F.R. § 51.44(a), the Commission's expert witness had no knowledge of the Department of Justice ever denying preclearance for lack of population deviation or otherwise communicating that it would be required to obtain preclearance.   If the Attorney General had ever done so, it is unbelievable that it would be unknown in the intensely scrutinized world of Voting Rights Act compliance.   The Commission does not contend the Attorney General ever did so.

5.   Nor does the Constitution grant Congress power to enact legislation requiring or permitting population inequality among voting districts.   The Fourteenth and Fifteenth Amendments grant Congress power to enforce by "appropriate legislation," which must be "plainly adapted" to the end of enforcing equal protection of the laws or preventing abridgement of the right to vote on account of race, consistent with "the letter and spirit of the constitution."   *Katzenbach v. Morgan*, 384 U.S. 641, 650–51 (1966). "Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as federal elections."   *Reynolds v. Sims*, 377 U.S. 533, 554 (1964).   The right to vote "includes the right to have the vote counted at full value without dilution or discount."   *Id.* at 555 n.29 (quoting with approval *South v. Peters*, 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).   Further,

> The conception of political equality from the Declaration of Independence to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote.

*Gray v. Sanders*, 372 U.S. 368, 381 (1963).   If Section 5 permits otherwise unconstitutional numerical vote dilution, it exceeds Congress's power to enforce the Fourteenth and Fifteenth Amendments' commands of equal voting rights.

Congress's inability to mandate systematic population inequality would not invalidate every preclearance effort with any population deviation.  That would not arise because other legitimate purposes for deviation will always come into play.  This case is in court precisely because the extent of the preclearance/malapportionment deviation outruns all others and must be defended on its own.

Statutory text, constitutional boundaries, and a half-century of administration without exception are all the same.  They take all seriousness out of the Commission's wild speculation that it can race to the bottom of population inequality to get preclearance.  Sources that lack the effect of law could not count against this, but even those sources confirm this conclusion.

6.  In its Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act, which explicitly "is not legally binding," the Department of Justice stated:

> Preventing retrogression under Section 5 does not require jurisdictions to violate the one-person, one-vote principle.

76 Fed. Reg. 7470, 7472 (Feb. 9, 2011).  The Department has also acknowledged the obvious, that compliance with constitutional equal population requirements could result in unavoidable retrogression.  Long ago the Department stated:

> Similarly, in the redistricting context, there may be instances occasioned by demographic changes in which reductions of minority percentages in single-member districts are unavoidable, even though "retrogressive," *i.e.*, districts where compliance with the one person, one vote standard necessitates the reduction of minority voting strength.

Revision of Procedures for the Administration of Section 5 of the Voting Rights Act of 1965, 52 Fed. Reg. 486, 488 (Jan. 6, 1987).  The current Guidance is to the same effect.  76 Fed. Reg. at 7472.  This concession to demographic change, where it happens, is dictated by the text of Section 5 itself, which does not forbid all retrogression in the minority's "ability to elect their preferred candidates of choice" as some of the Commissioners and their advisors unqualifiedly and repeatedly said.  Rather, to deny preclearance the text also requires that the retrogression be "on account of race or color or in contravention of the [language] guarantees."  The "on account of" language was

necessary to keep Section 5 validly within Congress's enforcement power.  But whether or not it is constitutionally necessary, it is there.  Retrogression because of relative population changes is not on account of race or language.

7.     The Court puts some weight on an "implication" in the Guidance that the Attorney General "might" require "slightly greater population deviation" to avoid retrogression.  Slip Op. at 46.  The Guidance notes that an alternative congressional plan with any increase in population deviation "is not considered a reasonable alternative" to a submitted plan.  The Guidance continues:

> For state legislative and local redistricting, a plan that would require significantly greater overall population deviations is not considered a reasonable alternative.

76 Fed. Reg. at 7472.

From this statement that a "significant" additional deviation would not be required, the Court infers that a deviation that is *not* "significant" "might" be required.  Supposing that is persuasive, the "slightly greater population deviation" that is not "significant" could not possibly support the Commission's stampede to the limits of population deviation.   "Significant" population deviation that "is not considered a reasonable alternative" certainly would include any deviation that would change a plan from what is otherwise legal to otherwise illegal.  That is the meaning of "significant" in usual legal discourse.

The Court next equates "not significant" with "minor population deviations," the technical term meaning below the 10% burden-shifting boundary.  Falling below 10% does not make population deviations constitutionally insignificant.  It just changes who has the burden of proof.

8.     There is much confusion in this case over whether the Commission tried to make too many Voting Rights Act districts.  Federal law does not limit a jurisdiction to creating only the number of such districts needed to avoid retrogression.  A jurisdiction may seek a margin of safety or go entirely beyond the Voting Rights Act if it thinks it good policy and complies with state and federal law.  A court does not second guess how

many such districts are needed or permitted because any number is permitted *if legal means are used to create them*.  But choosing to create such districts gives no absolution to use any districting practice that is otherwise illegal.  No matter how many or few majority-minority, minority-influence, or cross-over districts a jurisdiction tries to create, systematic population inequality is an illegal means to get there.

9.     This part of the discussion returns to where it began.  The Commission's assertion that preclearance was a legitimate redistricting goal at the time is correct and undisputed.  But that proves nothing.  What needs to be proved is that systematic population inequality that is otherwise irrational and discriminatory is a reasonable means to obtain preclearance, so as to count against the baseline force of equality under the Equal Protection Clause.

It begs the question to say population inequality is "compliance with a federal law concerning voting rights" without demonstrating that the meaning and effect of that federal law is to permit systematic population inequality.  Slip Op. at 44.  The Court circles its reasoning twice in finding the importance of preclearance in general comparable to that of some valid state purposes for deviation, but sliding past what means are legal and what effect the Act has.  It is no answer to say, "The question is not whether the Voting Rights Act *specifically* authorizes population deviations . . . ."  Slip Op. at 45 (emphasis added).  A statute does not have to "specifically" prohibit something if it generally prohibits it or it does not as a whole have the effect of legalizing what is otherwise illegal.

Federal equal protection doctrine is the gatekeeper for what are permissible state purposes for deviation.  Those state purposes need not be codified in state statutes.  But there is no independent state purpose here, only respect for federal law and the Supremacy Clause.  This is a case of first impression in another way, as it is the first time systematic malapportionment has been defended from the effect of a federal statute.  The dispensing effect must come from that federal statute, expressly, generally, or by

1    implication, or the defense fails.  It has nothing to do with whether truly independent

2    state purposes are codified in statutes.

3    **IV.    MIXED VALID AND INVALID PURPOSES**

4           Because the majority finds the Voting Rights Act a legitimate reason for

5    population inequality, they must decide what to make of one permitted and one possibly

6    forbidden purpose.  They propose different tests.  For Judge Clifton the case turns on

7    which consideration predominated.  For Judge Silver the impermissible motive has no

8    legal consequence unless it was the only motive.  Both tests are trying to grapple with the

9    problems of not diminishing other actual and valid purposes and not yielding to

10   theoretically valid purposes that are only pretext.

11          Both tests would need to be refined to work.  Mixed motives often have no

12   predominance.  Some motives are from different domains and incapable of quantitative

13   comparison.  A test of predominance of motives is subjective and unreviewable.  It

14   disguises judicial choice.  Literally, a test of single motive can never be met, not in this

15   kind of case, as covered jurisdictions must be motivated by Section 5 compliance.

16          There is a better statement of the test for cases of concurrent valid and invalid

17   purposes.  The law should defer to state districting authorities' actual, substantial, and

18   honest pursuit of a legitimate means for a legitimate purpose with systematic population

19   inequality, notwithstanding the actual and additional motive of party preferment.  But the

20   valid motive must fairly cover the entirety of the otherwise wrongful inequality.  Even a

21   valid means may not pass from reasonable application to pretext in any part.  Here the

22   Commission continued adjusting the map with an eye to depopulation for party advantage

23   even after the cover of the Voting Rights Act played out.  If the Commission's first acts

24   of depopulation had the cover, the last acts did not.  In light of the intervening

25   invalidation of Section 5 preclearance, if sent back for any reason to be redone in any

26   part, the Commission could not do again what it did here.

27

28

The difficulty of forming and applying any test for mixed motives shows why it should be left for a case in which it would matter.  It is not needed to decide this case, where neither motive justifies systematic partisan malapportionment.

## V.   OTHER MATTERS

The other opinions run in directions that cannot be responded to in every respect without prolonging this dissent.  The matters already addressed are enough to decide this case.  Brief additional comments follow.

1.   The Court says that "Counsel's advice does not insulate the Commission from liability, but it is probative of the Commission's intent."  Slip Op. at 52.  To that end, the Court concludes that the systematic population deviation was the result of "reasonable, good-faith efforts to comply with the Voting Rights Act" and that "the Commission's attorneys gave reasonable advice as to how to pursue what they identified as a legitimate objective, and the Commission appeared to act in accordance with that advice."  Slip Op. at 1, 52.  Counsel did not give advice that underpopulation for preclearance would thereby escape liability under the one person, one vote principle.  If their advice could be stretched to have said that, it would not be reasonable.

The Attorney General does not—and indeed, under his statutory authority could not—deny preclearance for any illegality except Section 5 retrogression.  The Guidance says:

> The Attorney General may not interpose an objection to a redistricting plan on the grounds that it violates the one-person, one-vote principle, on the grounds that it violates *Shaw v. Reno*, 509 U.S. 630 (1983), or on the grounds that it violates Section 2 of the Voting Rights Act. . . .  Therefore, jurisdictions should not regard a determination of compliance with Section 5 as preventing subsequent legal challenges to that plan under other statutes by the Department of Justice or by private plaintiffs.  42 U.S.C. 1973c(a); 28 CFR 51.49.

Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act, 76 Fed. Reg. 7470, 7470 (Feb. 9, 2011).  In the teeth of this explicit disclaimer that the Attorney General does not examine inequality of population and gives no protection against future challenge for it, any advice that unequal population is immunized from later challenge if it might help persuade the Attorney General to preclear would be unreasonable.

- 25 -

The Commission began with correct advice that any population deviation must be justified under federal constitutional standards and that no legal precedent said Section 5 preclearance justified any inequality or how much.   Their counsel informed them the question lacked a reliable answer and whatever they did must survive scrutiny if scrutiny came.   (Trial Ex. 361 at 11–14; Trial Tr. at 826:6–15.)   Later, the advisors offered pragmatic license but never circled back to actual legal analysis from sources and reasoning.   (Trial Ex. 395 at 114–16, 118–20; Trial Ex. 405 at 10–11, 14–15, 19, 30, 32, 36, 50.)   They gave bare conclusions, no principled exposition, and no written opinion.

At best this was advice to take a legal risk, which lawyers often counsel when there is possible benefit and no cost to their client from being wrong.   It could be taken as advice that the course of action complied with one person, one vote principles only by not taking it as a whole, which would not be reasonable.

2.   Both opinions contend that the Republican commissioners really approved the partisan inequality in the final plan they voted against because they had voted for some earlier changes that moved in that direction.   The Court leaves out the facts that refute it.   The Republican commissioners explained their voting for iterations of the map. Commissioners Freeman and Stertz objected to map changes that promoted Democratic Party advantage without justification.   (*See, e.g.*, Trial Ex. 405 at 30:18–31:8; Trial Ex. 406 at 240:21.)   The minutes from the public hearings and the Republican commissioners' trial testimony explain that Commissioner Stertz voted for the final tentative legislative map to stave off an attempt by Commissioner Herrera to introduce a "more extreme map" to favor Democratic Party interests that they thought was already prepared.   (Trial Tr. at 261:10–15, 877:17–879:8; Trial Ex. 406 at 266:14–267:3.)   The inference that, though voting against the final plan, the Republican commissioners actually accepted the plan because they did not protest at every opportunity throughout the meetings misses how people disagree in collective bodies if they hope for compromise later.   Concurring Op. at 14.

3.   In the Final Pretrial Order the Plaintiffs stated "unjustified population

deviations in legislative districting for the sole purpose of partisanship" as their claim, but they elaborated it and then summarized as follows:

> Accordingly, Plaintiffs must prove (A) the legislative districts deviate from equality, (B) the adjustments the Arizona Constitution authorized did not cause the deviations from strict equality, (C) deviations from equality are not the incidental result of adjustments made to attain legitimate state interests, and (D) no legitimate State interests justify or warrant the IRC's deviations from equality.

Their Trial Brief said the same thing: "Thus, Plaintiffs are bound to prove only that no legitimate and constitutional policy drove the population deviations." The Plaintiffs tried and proved that. This is the answer to the concurring Judge's concern that she is "not aware of any clear request by plaintiffs that we adopt something other than the 'actual and sole' reason standard." Concurring Op. at 10. It is in the quoted passages, and elsewhere.

4.     I join in the sections of the Per Curiam Opinion concerning dismissal of the individual commissioners, dismissal of the state law claims, denial of abstention, and legislative privilege. On the merits, the facts and findings in this dissent are sufficient to dispose of this case. Though I accept most of the factual narrative in the Opinion, I disagree with some, including some that matters under the Court's analysis. The facts that determine the outcome under the analysis in this dissent are few, simple, and, I believe, undisputed. Therefore, I join only in sections III.A, B, and C of the Opinion.

## VI.   PERSPECTIVE

This dissent applies voting rights equal protection doctrine as it has been settled for half a century. Deference to reasonable state policies begins the analysis, but deference stops where the state policy or its application is irrational or discriminatory. Systematic numerical inequality for partisan benefit is discriminatory and invidious viewpoint punishment or reward.

The first thing novel about this case is that, thanks to the reform of redistricting processes and standards in Arizona, state law itself now excludes most of the traditional pretexts for partisan inequality. Of necessity, the Commission summons up only the

Voting Rights Act as redeeming what is otherwise old-fashioned partisan malapportionment.

The second thing novel about this case is that, the Arizona voters having cast out that grossest of redistricting abuses, a *federal* law is now invoked to bless its return.  No other instance is found in which Congress is said to have ordered or permitted systematic population inequality that otherwise violates the Equal Protection Clause.

The third thing novel about this decision is the effect it has to give to the Voting Rights Act itself.  Assuming we could give Section 5 preclearance continuing reach into the future, it would be extraordinary that Congress used a law protecting equality of voting rights to authorize systematic partisan malapportionment, even defeating state law that prohibits it.

Systematic malapportionment is an affront to the rights and dignity of the individual.  The essential empowerments for that abuse are unaccountable discretion and ready pretexts to cover true motives.  Population equality is the most objective limitation on abusable discretion, and it cannot be used unfairly against anyone.  "[T]he equal-population principle remains the only clear limitation on improper districting practices, and we must be careful not to dilute its strength." *Cox v. Larios*, 542 U.S. 947, 949–50 (2004) (Stevens, J., concurring in summary affirmance).

Numeric equality yields to some other worthy goals, within limits.  Arizona voters left little to weigh against equality, and none of what they did allow is invoked here except homage to the Supremacy Clause.  With that wedge the Commission pries pervasive party malapportionment back into Arizona, in the name of Congress and federal statute.  It is a misplaced sense of federalism that stands aside while officers of a state that repudiated partisan malapportionment return to it on federal command that Congress never gave.

## VII.   CONCLUSION

Based on these findings of fact and conclusions of law, I would enter judgment for the Plaintiffs declaring that the Arizona Independent Redistricting Commission's

legislative redistricting plan violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.   I would enjoin the Commission to promptly prepare and promulgate a plan that is free of that error.

Dated:  April 29, 2014.

_____

Neil V. Wake
United States District Judge